## BOARD OF TRADE OF THE CITY OF CHICAGO *v.* CHRISTIE GRAIN AND STOCK COMPANY.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

## L. A. KINSEY COMPANY *v.* BOARD OF TRADE OF THE CITY OF CHICAGO.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

Nos. 224, 280. Argued April 20, 24, 25, 1905.—Decided May 8, 1905.

The Chicago Board of Trade collects at its own expense quotations of prices offered and accepted for wheat, corn and provisions in its exchange and distributes them under contract to persons approved by it and under certain conditions. In a suit brought by it to restrain parties from using the quotations obtained and used without authority of the Board, defendants contended that as the Board of Trade permitted, and the quotations related to, transactions for the pretended buying of grain without any intention of actually receiving, delivering or paying for the same, that the Board violated the Illinois bucket shop statute and there were no property rights in the quotations which the court could protect, and that the giving out of the quotations to certain persons makes them free to all. *Held*, that

Even if such pretended buying and selling is permitted by the Board of Trade it is entitled to have its collection of quotations protected by the law, and to keep the work which it has done to itself, nor does it lose its property rights in the quotations by communicating them to certain persons, even though many, in confidential and contractual relations

to itself, and strangers to the trust may be restrained from obtaining and using the quotations by inducing a breach of the trust.

A collection of information, otherwise entitled to protection, does not cease to be so because it concerns illegal acts, and statistics of crime are property to the same extent as other statistics, even if collected by a criminal who furnishes some of the data.

Contracts under which the Board of Trade furnishes telegraph companies with its quotations, which it could refrain from communicating at all, on condition that they will only be distributed to persons in contractual relations with, and approved by, the Board, and not to what are known as bucket shops, are not void and against public policy as being in restraint of trade either at common law or under the Anti-Trust Act of July 2, 1890.

THE facts are stated in the opinion.

*Mr. Henry S. Robbins* for petitioner in No. 224 and respondent in No. 280:

It is not a good defense to these suits that most of the transactions, out of which the quotations arise are gambling transactions. The violation by a plaintiff of a criminal statute of one State does not debar him from maintaining suits to protect his property in a Federal court in another State. Penal laws do not reach, in their effect, beyond the jurisdiction of where they are established. *Commonwealth* v. *Green,* 17 Massachusetts, 540, 674; *Logan* v. *United States,* 144 U. S. 263, 303; *State* v. *Pelican Ins. Co.,* 127 U. S. 265, 289; *The Antelope,* 10 Wheat. 66, 123; *Folliott* v. *Ogden,* 1 H. Blacks. 123, 135; *Fuller* v. *Berger,* 120 Fed. Rep. 274. And see also *City of Chicago* v. *Stock Yards,* 164 Illinois, 224, 238; *Bateman* v. *Fargason,* 4 Fed. Rep. 32; *Ansley* v. *Wilson,* 50 Georgia, 421; *Langdon* v. *Templeton,* 66 Vermont, 173; 1 Pom. Eq. § 399.

Petitioner's misconduct, if any, respecting the transactions upon its exchange, prejudicially affects these respondents only as it does the public at large.

The general dissemination of these quotations is conceded to be highly beneficial to legitimate commerce. Respondents' answer so admits. So the Illinois Supreme Court has also held. *Stock Exchange* v. *Board of Trade,* 127 Illinois, 153.

The Board of Trade's conduct with respect to the quotations, is not at all reprehensible. It gives them to all persons desiring them for lawful purposes, and only withholds them, as it lawfully may, from bucket shops.

As to the Illinois bucket shop law, see *Soby* v. *People,* 134 Illinois, 66. It does not apply to exchanges.

Market news, whose dissemination is helpful to commerce, is not to be deemed infected with illegality or beyond judicial protection, because the owner of this news maintains an exchange, where parties to most of the *transactions* it records do not contemplate actual delivery. The existence of a property right in news depends upon its source, rather than the character or utility of the news itself. *Brooks* v. *Martin,* 2 Wall. 79; *Planters' Bank* v. *Union Bank,* 16 Wall. 483, 499.

As matter of fact it is not true that most of the trades, whose prices these quotations record, are gambling transactions.

As to the principle and legality of the systems of offsetting or elimination of trades which will be found in most commercial exchanges, see *Clews* v. *Jamieson,* 182 U. S. 461; *Lehman* v. *Feld,* 37 Fed. Rep. 852; *Irwin* v. *Williar,* 110 U. S. 499; *Bibb* v. *Allen,* 110 U. S. 500.

The Board of Trade should not be held responsible for what gambling there is upon its exchange, and on that account be deprived of its right to sue to protect its property in its quotations.

There is a property right in the quotations which equity will protect by injunction.

Both in England and this country market news thus distributed as are these quotations, is a species of property, which a court of equity will protect by injunction. *Exchange Tel. Co.* v. *Gregory,* L. R. (1896), 1 Q. B. 147; *Dodge Co.* v. *Construction Co.,* 183 Massachusetts, 62; *Kiernan* v. *Manhattan Tel. Co.,* 50 How. Pr. 194; *Nat. Tel. News. Co.* v. *West. Un. Tel. Co.,* 119 Fed. Rep. 294; *Illinois Com. Co.* v. *Cleveland Tel. Co.,* 119 Fed. Rep. 301; *Cleveland Tel. Co.* v. *Stone,* 105

Fed. Rep. 594; *Board of Trade* v. *Hadden-Krull Co.*, 103 Fed. Rep. 902; *S. C.*, 109 Fed. Rep. 705; this case below 116 Fed. Rep. 944.

Board of Trade quotations are a species of property. *Stock Exchange* v. *Board of Trade*, 127 Illinois, 153.

That this market news is too evanescent to derive any protection from the Copyright Act, a perusal of that statute will show. *Nat. Tel. News Co.* v. *West. Un. Tel. Co., supra; Clayton* v. *Stone*, 2 Payne, 382; *S. C.*, Fed. Cas. 2872.

As to the protection of literary property, apart from the statutory provisions of copyright law, see *Millar* v. *Taylor*, 4 Burr, 2303; *Donaldson* v. *Becket*, 4 Burr, 2408; *Wheaton* v. *Peters*, 8 Pet. 591; *Holmes* v. *Hurst*, 174 U. S. 82; *Tompkins* v. *Halleck*, 133 Massachusetts, 32; *Palmer* v. *DeWitt*, 47 N. Y. 532. See other cases applying the same principle to dramas, exhibition of paintings, etc. *Macklin* v. *Richardson*, Ambl. 694; *Crowe* v. *Aiken*, 2 Biss. 208; *S. C.*, Fed. Cas. No. 3441; *Albert* v. *Strange*, 2 DeG. S. & M. 652; *Turner* v. *Robinson*, 10 Irish Ch. 121. And in the case of lectures. *Abernethy* v. *Hutchinson*, 1 Hall. & Tw. 28; *Caird* v. *Simes*, L. R. (1887) 12 H. L. 326. See also *Bartlette* v. *Chittenden*, 4 McLean, 300; *S. C.*, Fed. Cas. No. 1082.

The contracts between the Board of Trade and the telegraph companies are not illegal and are not in restraint of trade under the common law or any state or Federal statute, and as to duty of the Board to give out the quotations see *Stock Exchange* v. *Board of Trade*, 127 Illinois, 153; and *contra*, *Ladd* v. *F. C. P. & M. Co.*, 53 Texas, 172; *Delaware R. R. Co.* v. *Central Co.*, 45 N. J. Eq. 50; *State* v. *Ass'd Press*, 159 Missouri, 424; *Re Renville*, 46 App. Div. N. Y. 37; *Central Exch.* v. *Board of Trade*, 196 Illinois, 396; *Smith* v. *West. Un. Tel. Co.*, 84 Kentucky, 664; *Bryant* v. *West. Un. Tel. Co.*, 17 Fed. Rep. 825; *Bradley* v. *West. Un. Tel. Co.*, 9 Con. Law Bull. 223; 27 Am. & Eng. Ency of Law, 2d ed., 1039, 1094; Gray on Telegraphs, 19; Rev. Stat. Missouri, 1889, § 2338; Bucket Shop Statute of Illinois; *State* v. *Bell Tel. Co.*, 23 Fed. Rep

539; *Am. Tel. Co.* v. *Conn. Tel. Co.,* 49 Connecticut, 352; *Sullivan* v. *Post. Tel. Co.,* 123 Fed. Rep. 411; *Wilson* v. *N. Y. Comm. Tel. Co.,* 3 N. Y. Supp. 633. Nor is it a violation of the Sherman Act, or illegal at common law to impose restrictions as to use of quotations. *Whitwell* v. *Continental Tobacco Co.,* 125 Fed. Rep. 454; *Mitchell* v. *Reynolds,* 1 Poere Williams, 181; *Elliman* v. *Carrington,* L. R. 1901, 2 Ch. Div. 275; *Fowle* v. *Park,* 131 U. S. 88; *Bement* v. *Nat. Harrow Co.,* 186 U. S. 70; *United States* v. *E. C. Knight Co.,* 156 U. S. 1, 16; *Northern Securities Co.* v. *United States,* 193 U. S. 197, 338; *Hopkins* v. *United States,* 171 U. S. 578, 600; *Anderson* v. *United States,* 171 U. S. 604, 615; *United States* v. *Joint Traffic Association,* 171 U. S. 558; *Alexander* v. *State,* 86 Georgia, 246.

The anti-bucket shop acts were in force when the Sherman Act was passed. They promote public welfare. They were passed in the exercise of. the State's police power. Doubtless that power must yield, when necessary, to the paramount power of Congress to regulate commerce; but this court should not, in the absence of clear language, assume that Congress intended by this act to nullify these state statutes, if indeed it lawfully might do so. *Sherlock* v. *Alling,* 93 U. S. 99; *Plumley* v. *Massachusetts,* 155 U. S. 461; *Patterson* v. *Kentucky,* 97 U. S. 501; *Nashville Ry.* v. *Alabama,* 128 U. S. 96; *Hennington* v. *Georgia,* 163 U. S. 299.

Is it not a more reasonable construction of this act that Congress did not intend to cover this subject or invade this field at all, and that States may still, under their police power, prevent the transmission of quotations into a State for use there in a bucket shop?

*Mr. James H. Harkless* and *Mr. W. H. Rossington,* with whom *Mr. Chester H. Krum, Mr. Charles S. Crysler, Mr. Clifford Histed, Mr. Charles Blood Smith* and *Mr. J. S. West* were on the brief, for respondent in No. 244.

*Mr. Lloyd Charles Whitman* and *Mr. E. D. Crumpacker,* with whom *Mr. Jacob J. Kern, Mr. John A. Brown* and

*Mr. Peter Crumpacker* were on the brief, for the petitioner in No. 280.

The quotations are not property and cannot be impressed with a right of property by the Board of Trade. *Sayre* v. *Moore*, 1 East. Rep. 361; *Jefferys* v. *Boosey*, 4 H. L. Cas. 815; *Crowe* v. *Aiken*, 2 Bissell, 214; *Thompson* v. *Hubbard*, 131 U. S. 151; *Iolanthe Case*, 15 Fed. Rep. 442; *West. Pub. Co.* v. *Lawyers Coöp. Co.*, 64 Fed. Rep. 364; *Stowe* v. *Thomas*, Fed. Cas. No. 13,514, and cases cited by counsel for Board of Trade.

The Board of Trade has no property right or interest in or to the knowledge of the quotations, as they arise from the transactions of its members on the exchange. Cases cited *supra* and *Keene* v. *Wheatley*, Fed. Cas. No. 7644.

The right of property to mental or literary effort rests fundamentally upon the creative faculty which must have been exercised by the claimant or one through whom his title is derived.

Nothing can be the object of property which has not a corporeal substance. *Wheaton* v. *Peters*, 8 Pet. 591; nor be the object of property which is not capable of sole and exclusive enjoyment. *Millar* v. *Taylor*, 4 Burr, 2361; 2 Kent's Com. 320; Webster; Bouvier, sub. "Property"; Schouler's Personal Property, § 2; 1 Blackstone, 138; *Jones* v. *Van Zandts*, 4 McLean, 603. To be property it must be capable of distinguishable proprietary marks. *Jefferys* v. *Boosey*, 4 H. L. Cas. 869. The Board of Trade cannot alter the essential nature of the quotations. Its sole right of property is confined to the records themselves.

It has no property interest in quotations made up of transactions on its floor when the transactions are not based upon *bona fide* contracts of purchase and sale of the commodity dealt in. The cases in 127 Illinois and 103, 109 and 119 Fed. Rep., cited by counsel for the Board, are not determinative of this case.

The transactions on which the quotations are based are so

tainted with illegality that the Board cannot have a property right in them.

As to the illegality of transactions, where there is no intention of delivery of the commodity bought and sold, see *Counselman* v. *Reichert,* 103 Iowa, 430; *First Nat. Bank* v. *Oskaloosa Co.,* 66 Iowa, 41. As to methods of the Board of Trade see *Central Stock Exchange* v. *Board of Trade,* 196 Illinois, 396; *Higgins* v. *McCrea,* 116 U. S. 671. The testimony shows that no deliveries are intended in ninety five per cent of the transactions. The members of the Board occupy the relation of bucket shops to their customers and the Board is a bucket shop to the non-members. As to substitution of trade see *Clews* v. *Jamieson,* 182 U. S. 461, 471.

As to how transactions between members are to be determined as to the element of wager see *Irwin* v. *Williar,* 110 U. S. 499; *Melchert* v. *Am. Union Tel. Co.,* 11 Fed. Rep. 193; *Bernard* v. *Backhaus,* 9 N. W. Rep. 585, 596; *Dows* v. *Glaspel,* 60 N. W. Rep. 60; *Whitesides* v. *Hunt,* 97 Indiana, 191; *Edwards* v. *Hoeffinghoff,* 38 Fed. Rep. 639; *Embrey* v. *Jemison,* 131 U. S. 336; *Mohr* v. *Miseni,* 49 N. W. Rep. 862; *Pickering* v. *Chase,* 79 Illinois, 328.

The Board of Trade does not come into court with clean hands. It is violating the Illinois anti-bucket shop act of 1887. 1 Starr & Curtis Ann. Stat. 1304. That act was construed in *Soby* v. *People,* 134 Illinois, 68; *Weare Commission Company* v. *People,* 111 Ill. App. 116, affirmed 209 Illinois, 528. And see as to the protection of gambling transactions, *Beard* v. *Milmine,* 88 Fed. Rep. 868; *Schultze* v. *Holtz,* 82 Fed. Rep. 448.

The court will not protect trade-marks used to deceive the public or if the owner cannot otherwise come into court with clean hands. *Lawrence Co.* v. *Tennessee Co.,* 31 Fed. Rep. 776, 784; *Krauss* v. *Peebles,* 58 Fed. Rep. 585, 594; *Simonds* v. *Jones,* 82 Maine, 302; *Joseph* v. *Macowsky,* 96 California, 518; *Holman* v. *Johnson,* Cowp. 341; *Fetridge* v. *Wells,* 4 Abb. Pr. 144; *Hall* v. *Coppell,* 7 Wall. 542, 599.

The Board cannot restrict the publication; if it publishes the quotations it must publish for all. *Ladd* v. *Oxnard,* 75 Fed. Rep. 703; *Gottsberger* v. *Aldine Book Co.,* 33 Fed. Rep. 381; *Keene* v. *Wheatley,* Fed. Cas No. 7644.

The Board realizes the full avails of its property when it sells the quotations to the telegraph companies and the delivery to those companies is necessarily a publication to the world. *Bryant* v. *West. Un. Tel. Co.,* 17 Fed. Rep. 825, is not applicable; the distinction between restricted and general publication does not extend to matter of this kind. *Pierce & Bushnell* v. *Werckmeister,* 18 C. C. A. 431; *Tribune* v. *Ass'd Press,* 116 Fed. Rep. 126.

Assuming there ever was a right of property in the Board to these quotations they have by usage become impressed with a public use and the Board is estopped from discriminating with reference to such use. *Exchange* v. *Board of Trade,* 127 Illinois, 153; *Commission Co.* v. *Live Stock Exchange,* 143 Illinois, 239; *Board of Trade* v. *Central Exchange,* 196 Illinois, 396; *Munn* v. *Illinois,* 94 U. S. 126, and Rose's notes thereto; *State* v. *Gas Co.,* 34 Ohio St. 572; *Lindsey* v. *Anniston,* 104 Alabama, 261; *People* v. *King,* 110 N. Y. 418; *Rushville* v. *Gas Co.,* 132 Indiana, 575; *Zanesville* v. *Gas Co.,* 47 Ohio St. 1; *White* v. *Canal Co.,* 22 Colorado, 198; *Water Works Co.* v. *Schotter,* 110 U. S. 347; *Railroad Co.* v. *Wilson,* 132 Indiana, 517; *B. & O. Tel. Co.* v. *Bell Telephone Co.,* 23 Fed. Rep. 539; *Cotting* v. *Stock Yards Co.,* 183 U. S. 79. The conditions exacted of the public in the contract with the telegraph companies are unreasonable and tend to create a monopoly. *Kalamazoo &c. Co.* v. *Sootsma,* 84 Michigan, 194; *Railroad Co.* v. *Langlois,* 24 Pac. Rep. 209; *Lindsey* v. *Anniston,* 104 Alabama, 261; *Lough* v. *Outerbridge,* 143 N. Y. 277; *Railroad Co.* v. *Bowling Green,* 57 Ohio St. 345. Such contracts also violate the Sherman Anti-Trust Act. *Carter-Crume Co.* v. *Peurrung,* 86 Fed. Rep. 439. The business of telegraphing these quotations is interstate commerce. *Pensacola Tel. Co.* v. *West. Un. Tel. Co.,* 96 U. S. 1; *West. Un. Tel. Co.* v. *Texas,*

105 U. S. 460; *West. Un. Tel. Co.* v. *Pendleton,* 122 U. S. 347; *Addyston Pipe Case,* 175 U. S. 241; *Gibbons* v. *Ogden,* 9 Wheat. 1, 189, 210; *Brown* v. *Maryland,* 12 Wheat. 447; *Mobile* v. *Kimball,* 102 U. S. 691; *Bowman* v. *Chicago R. R. Co.,* 125 U. S. 490; *Ferry Co.* v. *Pennsylvania,* 114 U. S. 203; *Hopkins* v. *United States,* 171 U. S. 578, 590.

*Mr. Julien T. Davies, Mr. Abram I. Elkus* and *Mr. Garrard Glenn* by leave of the court, submitted a brief in behalf of Edwin Hawley and Frank H. Ray, solely on the nature of a wagering contract:

Contracts for purchase and sale of a commodity, not to be delivered but only to be performed by advancing and paying differences, are void at common law in the absence of statute. *Irwin* v. *Williar,* 110 U. S. 499; *Ball* v. *Davis,* 1 N. Y. St. Rep. 517; *Flagg* v. *Gilpin,* 17 R. L. Ired. 1, 10; *Rumsey* v. *Berry,* 65 Maine, 575; *Gregory* v. *Wendell,* 39 Michigan, 337; *Mohr* v. *Meisen,* 47 Minnesota, 228; *Brua's Appeal,* 55 Pa. St. 294; *Cunningham* v. *Bank,* 71 Georgia, 400; *Cothran* v. *Ellis,* 125 Illinois, 496.

The form of the contract is immaterial and the test is the actual intent of the parties at the time of making the contract. *Irwin* v. *Williar,* 110 U. S. 499; *Higgins* v. *McCrea,* 116 U. S. 671; *Embrey* v. *Jemison,* 131 U. S. 336; *Pierce* v. *Rice,* 142 U. S. 28; *Story* v. *Salomon,* 71 N. Y. 420; *Peck* v. *Doran-Wright Co.,* 57 Hun, 343; *Kenyon* v. *Luther,* 4 N. Y. Supp. 498; *Cover* v. *Smith,* 82 Maryland, 586; *Lester* v. *Buel,* 49 Ohio St. 240; *Rumsey* v. *Berry,* 65 Maine, 570; *Gregory* v. *Wendell,* 39 Michigan, 337; *Flagg* v. *Baldwin,* 38 N. J. Eq. 219; *Sharp* v. *Stalker,* 63 N. J. Eq. 596.

This intent may be proven by the circumstances surrounding the transactions and such proof is received with great liberality. *Kenyon* v. *Luther,* 4 N. Y. Supp. 498; *Ball* v. *Davis,* 1 N. Y. St. Rep. 517; *Dwight* v. *Badgely,* 60 Hun, 144; *Peck* v. *Doran-Wright Co.,* 57 Hun, 343; *Yerkes* v. *Salomon,* 11 Hun, 471; *Mackey* v. *Rausch,* 39 N. Y. St. Rep. 232; *In re*

*Green,* Fed. Cas. No. 5751; *Cobb* v. *Prell,* 15 Fed. Rep. 774; *In re Chandler,* Fed. Cas. No. 2590; *Mohr* v. *Meisen,* 47 Minnesota, 228; *Kirkpatrick* v. *Bonsall,* 57 Pa. St. 155; *Lowrey* v. *Dillmann,* 59 Wisconsin, 197; *Carroll* v. *Holmes,* 24 Ill. App. 453; *Hill* v. *Johnson,* 38 Mo. App. 383; *Croner* v. *Spencer,* 92 Missouri, 499; *Cothran* v. *Ellis,* 125 Illinois, 496.

Mr. Justice Holmes delivered the opinion of the court.

These are two bills in equity brought by the Chicago Board of Trade to enjoin the principal defendants from using and distributing the continuous quotations of prices on sales of grain and provisions for future delivery, which are collected by the plaintiff and which cannot be obtained by the defendants except through a known breach of the confidential terms on which the plaintiff communicates them. It is sufficient for the purposes of decision to state the facts without reciting the pleadings in detail. The plaintiff was incorporated by special charter of the State of Illinois on February 18, 1859. The charter incorporated an existing board of trade, and there seems to be no reason to doubt, as indeed is alleged by the Christie Grain and Stock Company, that it then managed its Chamber of Commerce substantially as it has since. The main feature of its management is that it maintains an exchange hall for the exclusive use of its members, which now has become one of the great grain and provision markets of the world. Three separate portions of this hall are known respectively as the Wheat Pit, the Corn Pit, and the Provision Pit. In these pits the members make sales and purchases exclusively for future delivery, the members dealing always as principals between themselves, and being bound practically, at least, as principals to those who employ them when they are not acting on their own behalf.

The quotation of the prices continuously offered and accepted in these pits during business hours are collected at the plaintiff's expense and handed to the telegraph com-

panies, which have their instruments close at hand, and by the latter are sent to a great number of offices. The telegraph companies all receive the quotations under a contract not to furnish them to any bucket shop or place where they are used as a basis for bets or illegal contracts. To that end they agree to submit applications to the Board of Trade for investigation, and to require the applicant, if satisfactory, to make a contract with the telegraph company and the Board of Trade, which, if observed, confines the information within a circle of persons all contracting with the Board of Trade. The principal defendants get and publish these quotations in some way not disclosed. It is said not to be proved that they get them wrongfully, even if the plaintiff has the rights which it claims. But as the defendants do not get them from the telegraph companies authorized to distribute them, have declined to sign the above-mentioned contracts, and deny the plaintiff's rights altogether, it is a reasonable conclusion that they get, and intend to get, their knowledge in a way which is wrongful unless their contention is maintained.

It is alleged in the bills that the principal defendants keep bucket shops, and the plaintiff's proof on that point fails, except so far as their refusal to sign the usual contracts may lead to an inference, but if the plaintiff has the rights which it alleges the failure is immaterial. The main defense is this. It is said that the plaintiff itself keeps the greatest of bucket shops, in the sense of an Illinois statute of June 6, 1887, that is, places wherein is permitted the pretended buying and selling of grain, etc., without any intention of receiving and paying for the property so bought, or of delivering the property so sold. On this ground it is contended that if under other circumstances there could be property in the quotations, which hardly is admitted, the subject matter is so infected with the plaintiff's own illegal conduct that it is *caput lupinum*, and may be carried off by any one at will.

. It appears that in not less than three-quarters of the transactions in the grain pit there is no physical handing over of

any grain, but that there is a settlement, either by the direct method, so called, or by what is known as ringing up. The direct method consists simply in setting off contracts to buy wheat of a certain amount at a certain time, against contracts to sell a like amount at the same time, and paying the difference of price in cash, at the end of the business day. The ring settlement is reached by a comparison of books among the clerks of the members buying and selling in the pit, and picking out a series of transactions which begins and ends with dealings which can be set against each other by eliminating those between—as, if A has sold to B five thousand bushels of May wheat, and B has sold the same amount to C, and C to D and D to A. Substituting D for B by novation, A's sale can be set against his purchase, on simply paying the difference in price. The Circuit Court of Appeals for the Eighth Circuit took the defendant's view of these facts and ordered the bill to be dismissed. 125 Fed. Rep. 161. The Circuit Court of Appeals for the Seventh Circuit declined to follow this decision and granted an injunction as prayed. 130 Fed. Rep. 507. Thereupon writs of certiorari were granted by this Court and both cases are here.

As has appeared, the plaintiff's chamber of commerce is, in the first place, a great market, where, through its eighteen hundred members, is transacted a large part of the grain and provision business of the world. Of course, in a modern market contracts are not confined to sales for immediate delivery. People will endeavor to forecast the future and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value is well known as a means of avoiding or mitigating catastrophes, equalizing prices and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be

touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain. This court has upheld sales of stock for future delivery and the substitution of parties provided for by the rules of the Chicago Stock Exchange. *Clews* v. *Jamieson,* 182 U. S. 461.

When the Chicago Board of Trade was incorporated we cannot doubt that it was expected to afford a market for future as well as present sales, with the necessary incidents of such a market, and while the State of Illinois allows that charter to stand, we cannot believe that the pits, merely as places where future sales are made, are forbidden by the law. But again, the contracts made in the pits are contracts between the members. We must suppose that from the beginning as now, if a member had a contract with another member to buy a certain amount of wheat at a certain time and another to sell the same amount at the same time, it would be deemed unnecessary to exchange warehouse receipts. We must suppose that then as now, a settlement would be made by the payment of differences, after the analogy of a clearing house. This naturally would take place no less that the contracts were made in good faith for actual delivery, since the result of actual delivery would be to leave the parties just where they were before. Set-off has all the effects of delivery. The ring settlement is simply a more complex case of the same kind. These settlements would be frequent, as the number of persons buying and selling was comparatively small.

The fact that contracts are satisfied in this way by set-off and the payment of differences detracts in no degree from the good faith of the parties, and if the parties knew when they make such contracts that they are very likely to have a chance to satisfy them in that way and intend to make use of it, that fact is perfectly consistent with a serious business purpose and an intent that the contract shall mean what it says. There is no doubt, from the rules of the Board of Trade or the evidence,

that the contracts made between the members are intended and supposed to be binding in manner and form as they are made. There is no doubt that a large part of those contracts is made for serious business purposes. Hedging, for instance, as it is called, is a means by which collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, secure themselves against the fluctuations of the market by counter contracts for the purchase or sale, as the case may be, of an equal quantity of the product, or of the material of manufacture. It is none the less a serious business contract for a legitimate and useful purpose that it may be offset before the time of delivery in case delivery should not be needed or desired.

Purchases made with the understanding that the contract will be settled by paying the difference between the contract and the market price at a certain time, Embrey v. Jemison, 131 U. S. 336, Weare Commission Co. v. People, 209 Illinois, 528, stand on different ground from purchases made merely with the expectation that they will be satisfied by set-off. If the latter might fall within the statute of Illinois, we would not be the first to decide that they did when the object was self-protection in business and not merely a speculation entered into for its own sake. It seems to us an extraordinary and unlikely proposition that the dealings which give its character to the great market for future sales in this country are to be regarded as mere wagers or as "pretended" buying or selling, without any intention of receiving and paying for the property bought, or of delivering the property sold, within the meaning of the Illinois act. Such a view seems to us hardly consistent with the admitted fact that the quotations of prices from the market are of the utmost importance to the business world, and not least to the farmers; so important indeed, that it is argued here and has been held in Illinois that the quotations are clothed with a public use. It seems to us hardly consistent with the obvious purposes of the plaintiff's charter, or indeed with the words of the statute invoked. The

sales in the pits are not pretended, but, as we have said, are meant and supposed to be binding. A set-off is in legal effect a delivery. We speak only of the contracts made in the pits, because in them the members are principals. The subsidiary rights of their employers where the members buy as brokers we think it unnecessary to discuss.

In the view which we take, the proportion of the dealings in the pit which are settled in this way throws no light on the question of the proportion of serious dealings for legitimate business purposes to those which fairly can be classed as wagers or pretended contracts. No more does the fact that the contracts thus disposed of call for many times the total receipts of grain in Chicago. The fact that they can be and are set-off sufficiently explains the possibility, which is no more wonderful than the enormous disproportion between the currency of the country and contracts for the payment of money, many of which in like manner are set off in clearing houses without any one dreaming that they are not paid, and for the rest of which the same money suffices in succession, the less being needed the more rapid the circulation is.

But suppose that the Board of Trade does keep a place where pretended and unlawful buying and selling are permitted, which as yet the Supreme Court of Illinois, we believe, has been careful not to intimate, it does not follow that it should not be protected in this suit. The question whether it should be involves several elements which we shall take up in turn.

In the first place, apart from special objections, the plaintiff's collection of quotations is entitled to the protection of the law. It stands like a trade secret. The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff's. Compare *Bleistein* v. *Donaldson Lithographing Co.*, 188 U. S. 239, 249, 250. The plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relations

to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust and using knowledge obtained by such a breach. *Exchange Telegraph Co.* v. *Gregory & Co.,* [1896] 1 Q. B. D. 147; *F. W. Dodge Co.* v. *Construction Information Co.,* 183 Massachusetts, 62; *Board of Trade* v. *C. B. Thomson Commission Co.,* 103 Fed. Rep. 902; *Board of Trade* v. *Hadden-Krull Co.,* 109 Fed. Rep. 705; *National Tel. News Co.* v. *Western Union Tel. Co.,* 119 Fed. Rep. 294; *Illinois Commission Co.* v. *Cleveland Tel. Co.,* 119 Fed. Rep. 301.

The publications insisted on in some of the arguments were publications in breach of contract, and do not affect the plaintiff's rights. Time is of the essence in matters like this, and it fairly may be said that, if the contracts with the plaintiff are kept, the information will not become public property until the plaintiff has gained its reward. A priority of a few minutes probably is enough.

If then the plaintiff's collection of information is otherwise entitled to protection, it does not cease to be so, even if it is information concerning illegal acts. The statistics of crime are property to the same extent as any other statistics, even if collected by a criminal who furnishes some of the data. The Supreme Court of Illinois has recognized in the fullest terms the value and necessity of the knowledge which the plaintiffs control. It must have known, even if it did not have the evidence before it, as to which we cannot tell from the report, what was the course of dealing on the exchange. Yet it was so far from suggesting that the plaintiff's work was unmeritorious that it held it clothed with a public use. *New York & Chicago Grain & Stock Exchange* v. *Board of Trade,* 127 Illinois, 153.

The defendants lay hold of the declaration in the case last cited and say, with doubtful consistency, that this information is of such importance that it is clothed with a public use, and that, therefore, they are entitled to get and use it. In the case referred to it was held that the plaintiff, which had been re-

ceiving the continuous quotations, was entitled still to receive them on paying for them and submitting to all reasonable requirements in relation to the same. Perhaps the right of the plaintiff would have been more obvious if it had demanded an opportunity on reasonable conditions of collecting the information for itself, especially if the legislature had seen fit to provide by law for its doing so. But it is not necessary to consider whether we are bound by that decision, or, if not, should follow it, since in these cases the claim is not qualified by submission to reasonable rules or an offer of payment. It is a claim of independent rights and a denial that the plaintiff has any right at all. The Supreme Court of Illinois gave no sanction to such a claim as that.

Finally it is urged that the contracts with the telegraph companies violate the act of July 2, 1890, c. 647, 26 Stat. 209. The short answer is that the contracts are not relied on as a cause of action. They are stated simply to show that the only communication of its collected facts by the plaintiff is a confidential communication, and does not destroy the plaintiff's rights. But so far as these contracts limit the communication of what the plaintiff might have refrained from communicating to any one, there is no monopoly or attempt at monopoly, and no contract in restraint of trade, either under the statute or at common law. *Bement* v. *National Harrow Co.*, 186 U. S. 70; *Fowle* v. *Park*, 131 U. S. 88; *Elliman* v. *Carrington*, [1901] 2 Ch. 275. It is argued that the true purpose is to exclude all persons who do not deal through members of the Board of Trade. Whether there is anything in the law to hinder these regulations being made with that intent we shall not consider, as we do not regard such a general scheme as shown by the contracts or proved. A scheme to exclude bucket shops is shown and proclaimed, no doubt—and the defendants, with their contention as to the plaintiff, call this an attempt at a monopoly in bucket shops. But it is simply a restraint on the acquisition for illegal purposes of the fruits of the plaintiff's work. *Central Stock & Grain Exchange* v.

*Board of Trade,* 196 Illinois, 396.   We are of opinion that the plaintiff is entitled to an injunction as prayed.

*Decree in No. 224 reversed.   Decree in No. 280 affirmed.*

MR. JUSTICE HARLAN, MR. JUSTICE BREWER and MR. JUSTICE DAY dissent.