DANIELS et al. v. PORTLAND GOLD MINING CO. et al.

(Circuit Court of Appeals, Eighth Circuit.   November 23, 1912.)

No. 3,755.

1. INJUNCTION (§§ 34, 102*)—SCOPE OF REMEDY.
    Though a writ of injunction may be properly employed to protect rights of property, however great or small, complicated or simple, it should not be made a vehicle for invading the legitimate legislative province of government or a means of establishing a system of rules for the regulation of the business of a community, nor should it be used as an ordinary supplement to the criminal laws of the state.
    [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 74–81, 176; Dec. Dig. §§ 34, 102.*]

2. INJUNCTION (§ 34*)—SUBJECTS OF JURISDICTION—REGULATION OF BUSINESS.
    A federal court of equity is without authority at suit of private parties to enjoin certain persons from entering upon and conducting a lawful business in which others are engaged without restrictions, except subject to regulations prescribed by the court, and designed to prevent them from making the business a cover for criminal operations. Such regulation of a business is an exercise of the police power of the state and a legislative function, which, even when so exercised, must be general in its application.
    [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 74–81; Dec. Dig. § 34.*]

3. INJUNCTION (§ 34*)—SCOPE OF REMEDY—REGULATION OF BUSINESS.
    At suit of three nonresident mining corporations, brought as alleged in behalf of themselves and many others, some named and some unknown, engaged in mining, milling, buying, and selling ore in a large mining district, a federal court granted an injunction restraining a number of defendants, who were residents of the district, from operating assay offices therein, or purchasing ore produced in the district without first notifying complainants or their representative of any offers of ore and in effect obtaining complainant's consent to its treatment or purchase. The purpose of the injunction was to prevent defendants from conducting business as "high-grade assayers" in purchasing stolen ore, but there were other assayers and dealers in the district, some of whom were, as alleged, interested as complainants. *Held*, that such injunction was an inadmissible exercise of judicial power.
    [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 74–81; Dec. Dig. § 34.*]

    Sanborn, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

Suit in equity by the Portland Gold Mining Company and others against Charles Daniels and others. Defendants appeal from an order granting a preliminary injunction. Reversed.

Edward C. Stimson, of Denver, Colo. (James J. Banks, Lawrence Lewis, Francis J. Knauss, and Page M. Brereton, all of Denver, Colo., on the brief), for appellants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Charles S. Thomas, of Denver, Colo. (George L. Nye, W. P. Malburn, and W. H. Bryant, all of Denver, Colo., and Hildreth Frost, of Colorado Springs, Colo., on the brief), for appellees.

Before SANBORN and HOOK, Circuit Judges, and WILLARD, District Judge.

HOOK, Circuit Judge. This is a suit by three mining companies, two being citizens of other states than Colorado and one a citizen of Great Britain, on behalf of themselves and more than a hundred other corporations and individuals named in the bill, and also many others not named because unknown, all engaged in mining, milling, buying, or selling ore in the Cripple Creek mining district of Colorado, to enjoin a number of persons who are citizens of that state from operating assay offices, and from purchasing ore produced in that district. It is alleged that all the mineowners of that territory, whether named or not, have a common interest in the object of the suit, and in the judgment of complainants would join in it if they could be seen. The gist of the complaint set forth with much detail is that high-grade gold ore worth from $1 to $100 per pound is being constantly stolen in small quantities, but of large aggregate, from the mines and the mills, smelters, and other places where ore is treated, by employés, lessees, and others, and that the criminal practice is knowingly encouraged and facilitated by defendants, who, under the pretense of conducting assay offices, receive the stolen property and buy it for a percentage of its value. In other words, it is claimed that the defendants, who in the language of the region are called "high-grade assayers," conduct "fences" or places where the thieves dispose of the stolen property. The prayer of the bill is that they be enjoined from conducting assay offices, and from purchasing or receiving ore not only from complainants' employés and lessees, but also from any other person in the mining district.

The trial court gave complainants a temporary injunction restraining defendants from purchasing, receiving for treatment, handling, or in any manner dealing in any ore, ore products, or other materials from mines or mills in the Cripple Creek mining district without first notifying the superintendent of one of the three companies which brought the suit at the company office, or the "secretary of the Cripple Creek District Mineowners & Operators Association" at its office in Victor or Cripple Creek, Colo., as the representative of complainants, of the fact that the ore, product, or material had been offered for sale, treatment, or handling, and giving the name of the person who offered it, the name of the mine or mill from which it purported to come, the owner thereof and the number of pounds, and also stating that its original condition when first offered had not been changed or altered. It was further provided in the order of injunction that, if either of the superintendents or the secretary as the representative of complainants should within 24 hours after receipt of such a notice from a defendant notify him, in turn, that the ore or material had been stolen from a complainant, then the defendant must hold it for

48 hours thereafter before purchasing, treating, or dealing with it or agreeing to do so, and, finally, defendants were enjoined from treating, handling, or dealing in any ore, ore products, or materials of any kind or description except under the foregoing conditions and restrictions.

[1] We think the injunction was an inadmissible exercise of the judicial power. Consistently with the fullest recognition of the progressive and flexible character of equity jurisprudence and its continuing adaptability to the increasing magnitude and complexity of modern affairs, care must nevertheless be taken not to transgress its fundamental limitations. Though the writ of injunction may be properly employed to protect rights of property, however great or small, complicated or simple, it should not be made a vehicle for invading the legitimate legislative province of government or a means of establishing a system of rules for the regulation of the business of a community. Nor should it be used as an ordinary supplement to the criminal laws of the state. There are several features of complainants' bill, which is most skillfully drawn, and of the proofs and order of injunction that at once attract notice. The suit was brought by three out of a large number of corporations and individuals engaged in mining, milling, buying, and selling the products of a great mining district. It was framed for the protection of the interests of all, known and unknown, who were engaged in the business. The presence in the suit of all of them, either actually or in a representative way, was, practically speaking, vital to the relief sought, because it contemplated the exclusion of defendants from the right to assay, treat, buy, sell, or handle in any manner or form any of the products of the mines or mills in the district by whomsoever produced. An injunction as broad as the prayer of the bill would affect the right of every mine and mill owner to do with his product as he pleased. While it was averred that high-grade ore was easily recognized upon casual inspection, it was not claimed that the ore of the three complainants, whether high grade or low grade, was distinguishable from that of the hundred and more other companies and persons named in the bill or of the many others unknown and not named. It was therefore necessary that the suit proceed as upon a common concert of all the mining and milling industries of the district. This is so because if any of them stood upon their right, which the court could not lawfully deny, to employ a defendant as an assayer or to sell or otherwise intrust to him their product, the sweeping object of the suit would be defeated. It cannot be supposed that at the instance of some the court would restrain or regulate all of them in the exercise of their legal rights. At this point we pass by the question of jurisdiction based on the contention that as gauged by the object of the bill all the mine and mill owners were indispensable as parties complainant, and the fact that many of them were citizens of Colorado as were the defendants.

Again, it appears from the bill and the proofs at the hearing that some of those in whose interest the suit was brought were themselves engaged in buying, selling and handling the mine products, also that there were assayers attached to some of the mines and mills and also independent assayers not so attached, but legitimately engaged in the

custom business on their own account. Their methods of doing business and the care they took to avoid stolen property were explained. These people were not to be affected by the suit. The order of injunction itself impliedly recognized the natural right of every person to be an assayer or to buy and sell the products of the mines, but it undertook judicially to establish a general line of cleavage between honesty and dishonesty in the conduct of occupations which are intrinsically lawful and open to the pursuit of all. To do so it prescribed regulations to be observed by defendants and to be worked out through an agency composed of representatives of the complainants; and it prohibited defendants from engaging in the business at all except upon the conditions laid down. Even in legislation of that character the administration is committed, not to interested private parties, but to public officials.

The case did not proceed as upon a series of specific trespasses by particular defendants against the property of particular complainants and to prevent a continuance of them; but there was an attempt to make its scope unusually broad by including as complainants every mine and mill owner in the district, whether or not his ore had been stolen and handled by defendants, and by including all the defendants, whether or not each had trespassed upon the rights of all the complainants. And, even if this were proper, the defendants were enjoined, not merely from continuing their wrongful practices, but also from thereafter following honestly a lawful occupation except according to regulations laid down by the court. The cases relied on as precedents show how far the injunction here has gone afield. Two of them are typical. In Board of Trade v. Christie, 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, the defendants, who kept bucket shops, were enjoined, not from continuing their business except under regulations nor from using the market quotations of others, but only from continuing the use of complainants' quotations which they obtained surreptitiously and without right, and this though the bucket shops were as unlawful as it is claimed the shops of the high-grade assayers were, and depended as much on the quotations as the defendants did on stolen ore. And as for being a public nuisance, which is urged here as a supporting ground, there is no essential difference between a place where gambling is done as in bucket shops, and one where stolen property is handled. In the board of trade case the court confined itself to the protection of the distinct rights of the complainants, and left the prohibition or regulation of defendants' business to other departments of the government. Bitterman v. Railroad, 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693 (reported below as Louisville & N. R. Co. v. Bitterman, 75 C. C. A. 192, 144 Fed. 34, and Id. [C. C.] 128 Fed. 176), was a suit to enjoin ticket brokers or scalpers from dealing in nontransferable reduced rate railroad tickets over the complainant's line of road. It has the same distinguishing aspects as the bucket shop case. It may be further noted that the injunction granted was only against the defendants, their agents, etc., though complainant asked that it be "broad enough to include all who knowingly do what the order of the court prohibits defendants from doing." Nor was

there in that case an attempt to secure an injunction for the benefit of all other railroad companies operating in the territory or district in question by averments such as we have in the present case.

[2, 3] Ordinary business callings may be attended by conditions, or may offer temptations that threaten the public welfare or the lives, health, morals, or property of those who come in contact with them. There is a stage at which the state will take cognizance and prescribe rules and regulations to prevent or lessen the evil. If the evil is deemed greater than the good, the calling may be wholly prohibited; if less, regulated. But, whatever course is taken, it is the exercise of the police power of the state, of which a multitude of illustrations may be found in the statute books, and its expression as a rule of conduct is a legislative function. Thus in many states the business of bucket shops and ticket scalpers is prohibited, and in Colorado there is a statute regulating the business of assayers and designed to prevent the very practices complained of here. Legislative regulations may be inadequate, but a court in a suit between private parties must act within much narrower lines and cannot make others. Its decree must conform more closely to the specific infringement of the property rights of the complainant.

The order of injunction is reversed. The cause is remitted to the trial court for amendment of the bill if desired, under its orders and conformably to the foregoing conclusions, or, failing amendment, for dismissal.

SANBORN, Circuit Judge (dissenting). Lord Chancellor Cottenham, presiding in the High Court of Chancery in England in 1841 said in Wollworth v. Holt, 4 Mylne & Craig, 619, 635:

"I think it the duty of this court to adapt its practice and course of proceeding to the existing state of society, and not by too strict an adherence to forms and rules established under different circumstances to decline to administer justice and to enforce rights for which there is no other remedy. This has always been the principle of this court, though not at all times sufficiently attended to. It is the ground upon which the court has in many cases dispensed with the presence of parties who would according to the general practice have been necessary parties."

He was accustomed to repeat and to act upon that declaration. Taylor v. Salmon, 4 Mylne & Craig, 134, 141; 7 Beav. 323, 327.

Mr. Justice Brewer in 1891, in answer to a challenge of the power of a court of equity to decree specific performance of a contract for 999 years, regarding the joint use by railroad companies of the Omaha bridge and certain railroad tracks of the Union Pacific Company, involving many details of operation, after citing Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843, in which the Supreme Court affirmed a decree which he had rendered in the court below against seemingly adverse precedents, and the proceedings of Judge Dillon, his predecessor as circuit judge of this circuit, in the seizure of the property of insolvent railroad companies and the creation of millions of dollars of obligations against them, said:

"I then watched those proceedings with something of amazement, but the more I studied the more I admired, till, thus having studied at the feet of

Gamaliel, I learned to believe that the powers and processes of a court of equity are equal to any and every emergency. They are potent to protect the humblest individual from the oppression of the mightiest corporation; to protect every corporation from the destroying greed of the public; to stop state or nation from spoliating or destroying private rights; to grasp with strong hand every corporation, and compel it to perform its contracts of every nature, and do justice to every individual." Chicago, R. I. & P. Ry. Co. v. Union Pacific Ry. Co. [C. C.] 47 Fed. 15, 26.

These views are rational and sound, sustained by the decisions of the courts of chancery and the history of equity jurisprudence, and it seems to me that a court of equity is neither without power nor without duty at the suit of owners otherwise remediless, to enjoin the continuing conscious purchasers of stolen property whose purchases cause the continuing theft of that property, from buying or using it until the owners have reasonable time and opportunity to inspect, identify, and recover it. And that is the proposition on which this suit is based. The complainants allege these facts in their bill: They are the owners of their mines and ores, and are mining the ores by the use of lessees and employés. The workmen in their mines continually steal their high-grade ores in small quantities which they conceal and carry away in their clothes and sell to the defendants. These high-grade ores are readily distinguishable from low-grade ores by sight. All the high-grade ores bought or sold in small quantities are stolen ores. Each of the defendants is engaged in the business of buying and selling this stolen ore, and in no other business. Each of them knows that the ores he buys have been stolen. The averment of the bill on this subject is in these words:

"Your orators further aver that the respondents herein, and each of them, are engaged in the business of conducting high-grade assay offices, or act as middlemen and agents of such offices, that none of them are in the legitimate business of assaying, although pretending so to be, but are engaged solely in the business of buying ores, which they know have been stolen from one or the other of the mines of the Cripple Creek district, and, having bought the same, they reduce such ores to bullion, or sell and dispose of the same in its crude state."

The defendants encourage and induce the workmen to steal these high-grade ores, and, if they did not do so and did not purchase these ores, no high-grade ores would be stolen. The complainants have no adequate remedy at law, or in any other way than by the injunction sought. Actions at law for the stolen ore, or its value, against the defendants or the workmen would not stop the continuing thefts and sales and would be futile on account of their necessary number and expense. The damage from the continuing wrongful acts of the defendants reaches tens of thousands of dollars, and it is irreparable. It is secretly inflicted, and proof and recovery of it by actions at law are impossible.

I agree with Judge Farrington, whose learned opinion upon a similar state of facts may be found in Goldfield Consolidated Mines Co. v. Richardson (C. C.) 194 Fed. 198, 202, 206, and with Judge Lewis, who granted the injunction below, that these facts state a perfect cause of action in equity for an injunction against the continuing

causings by the defendants of the continuous thefts of the complainants' ores by their workmen.

The opinion of the majority, which assails the equity of the bill in this suit, seems to me to give too little effect to its dominant averment that the defendants are not engaged in the lawful business of assaying, or buying or selling ore, or in any other legitimate business, but are engaged solely in buying and selling stolen high-grade ore which they know to have been stolen and causing the workmen of the complainants to steal it. In determining the sufficiency of the bill to state an equitable cause of action, every averment which it contains must be taken as true. The result is that the defendants are engaged in the single occupation and business of knowingly maintaining a fence for stolen ore and inducing workmen to steal it from the complainants and others. All the ore they have handled and all they threaten to handle is high-grade stolen ore, and they know it. Therefore they have no legal right to assay any of this ore, to buy it, or to sell it. If they have mixed, or shall mix, the ore stolen from the three complainants with ore stolen from others, or if these ores have been so mixed by the thieves that the ore of the complainants cannot be identified, this mixing was or will be such a wrongful act that if it be necessary to protect the property of these complainants their equity is so strong that an injunction against the purchase, assay, and sale of any ore by the defendants may well be sustained because they purchase and threaten to purchase ore which they know to be stolen only, and the equity of these complainants in the protection of their property from theft is far superior to the equity or right of the defendants to carry on their nefarious business, because they have no right whatever to conduct their business and their protection in the conduct of that business, or in their claim to the stolen ore is abhorrent to equity. It is no defense to a suit by one of several persons against a thief who has stolen goods from all of them, or against a receiver of the goods who knew they were stolen, that the lawful proceedings necessary to a recovery of the plaintiff's goods, or their value, may somewhat embarrass or delay his escape with the stolen goods of the others, or diminish his profits from their taking and conversion.

Returning now to the right of the complainants to an injunction on the facts alleged in the bill, bearing in mind that the defendants are engaged exclusively in the unlawful business of buying and converting property which they know to have been stolen from the three complainants and others, and in thereby causing the stealing of these ores from the complainants here, why should they not be enjoined from continuing these wrongful acts? In Illinois Central R. Co. v. Caffrey (C. C.) 128 Fed. 770, 774, Judge Thayer laid down the general rule that, whenever defendants engage in an unlawful calling, productive of injury to others, they may be enjoined from pursuing that calling and from doing the wrongful injurious acts. In support of that proposition he cited Hopkins v. Oxley Stave Co., 83 Fed. 912, 919, 28 C. C. A. 99, 106, and cases there cited; Sherry v. Perkins, 147 Mass. 212, 17 N. E. 307, 9 Am. St. Rep. 689; Kinner v. Lake Shore & M. S. Ry. Co., 69 Ohio St. 339, 69 N. E. 614; Schubach v. McDonald, 179 Mo. 163, 78 S. W. 1020, 65 L. R. A. 136, 101 Am. St. Rep. 452; National

Telegraphic News Co. v. Western Union Tel. Co., 56 C. C. A. 198, 119 Fed. 294, 60 L. R. A. 805; In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092, and he added, "Indeed, it would be a misfortune if courts of equity were powerless to redress grievances of that kind." In that case, in Bitterman v. Louisville & Nashville R. R. Co., 207 U. S. 205, 223, 226, 28 Sup. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693, and in many other cases of that class, ticket scalpers were enjoined from buying nontransferable railroad tickets, and from thereby causing breaches of the contracts between the railroad companies and the purchasers of the tickets from them.

In Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 251, 25 Sup. Ct. 637, 49 L. Ed. 1031, strangers to a trust in continuous quotations on the board of trade were enjoined from using those quotations, and thereby inducing a breach of trust by the trustees. In Mills v. New Orleans Seed Co., 65 Miss. 391, 393, 394, 4 South. 298, 7 Am. St. Rep. 671, the defendant was enjoined from continuously taking and using bags sent by the complainant to purchasers of cotton to induce them to pack their cotton therein and send it to the complainant. The Supreme Court of Mississippi declared that an injunction was warranted by willful and continuous wrongs committed and threatened, and by the fact that the complainant's rights could not be protected and enforced by proceedings at law, except by numerous and expensive suits, and it said that:

"The ends of justice require, in such case, that the whole wrong shall be arrested and concluded in a single proceeding. And such relief equity affords, and thereby fulfills its appropriate mission of supplying the deficiencies of legal remedies."

In Lembeck v. Nye, 47 Ohio St. 336, 353, 355, 24 N. E. 686, 8 L. R. A. 578, the defendants were enjoined at the suit of the owner of a lake from letting boats for hire thereon, and thereby inducing third parties to trespass on the lake by rowing and fishing.

If parties may be lawfully enjoined from pursuing an unlawful calling, or doing unlawful injurious acts, which merely cause breaches of contracts, or of trusts between complainants and third parties, or mere trespasses upon the complainants' property, how much more should they be enjoined from pursuing an unlawful and criminal calling and from committing unlawful and criminal acts which induce third parties to commit crimes to the irreparable injury of the complainants! I am unable to divest my mind of the view that it is within the power and the duty of a court of equity, at the suit of owners otherwise remediless, to enjoin the defendants in this case from pursuing the unlawful and criminal calling of continually purchasing in small amounts high-grade ores which they know to have been stolen, and from purchasing, assaying, or selling such property, and thereby causing the theft of this property from the complainants and others to their irreparable injury, and that the bill in this suit presents a state of facts which warrants and entitles the plaintiff to such an injunction. Goldfield Consolidated Mines Co. v. Richardson (C. C.) 194 Fed. 198, 202, 206; Bitterman v. Louisville & Nashville R. R. Co., 207 U. S. 205, 223, 226, 28 Sup. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693; Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236,

251, 25 Sup. Ct. 637, 49 L. Ed. 1031; Illinois Central R. R. Co. v. Caffrey (C. C.) 128 Fed. 770, 772; Lembeck v. Nye, 47 Ohio St. 336, 353, 355, 24 N. E. 686, 8 L. R. A. 578; Warren Mills v. New Orleans Seed Co., 65 Miss. 391, 393, 394, 4 South. 298, 7 Am. St. Rep. 671; Dimick v. Shaw, 94 Fed. 266, 268, 36 C. C. A. 347; United States Freehold Land & Emigration Co. v. Gallegos, 32 C. C. A. 470, 89 Fed. 769.

To the objection that the issue of the injunction is the exercise of a legislative power, and hence not permissible to the judiciary, because it prohibits the pursuit of the unlawful calling until and unless an opportunity to inspect the stolen ore and to recover that stolen from the complainants, if such is found, is first given to one of their representatives named by the court, and thus regulates the future conduct of the defendants' illegal business, there seem to me to be two good answers. The first is that this is the same objection, phrased in words a little variant, which was made to the injunctions in the ticket scalpers cases and was well answered by the Supreme Court and by Judge Thayer in those suits. Bitterman v. Louisville & Nashville R. R. Co., 207 U. S. 205, 223, 226, 28 Sup. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693; Illinois Central R. R. Co. v. Caffrey (C. C.) 128 Fed. 770, 773, 774. Judge Thayer said:

"It may be conceded that it is not the function of courts of equity to make laws or to command people not to do a given act, when they have not threatened to do it or given evidence of such an intention. But when one has manifested his purpose to commit a legal wrong, and the act is of such a nature that the injured party cannot obtain adequate redress in a court of law, then a court of equity may intervene."

The Supreme Court said:

"It is insisted that the Circuit Court of Appeals erred in awarding an injunction as to dealings 'in nontransferable tickets that may be hereafter issued * *. * since it thereby undertook to promulgate' a rule applicable to conditions and circumstances which have not yet arisen, and to prohibit 'the petitioners from dealing in tickets not in esse, * * * and is therefore violative of the most fundamental principles of our government.' But, when the broad nature of this proposition is considered, it but denies that there is power in a court of equity in any case to afford effective relief by injunction. Certain is it that every injunction in the nature of things contemplates the enforcement as against the party enjoined of a rule of conduct for the future as to the wrong to which the injunction relates. Take the case of trespasses upon land where the elements entitling to equitable relief exist. See Slater v. Gunn, 170 Mass. 509 [49 N. E. 1017, 41 L. R. A. 268], and cases cited. * * * The action of the Circuit Court of Appeals, therefore, in causing the injunction to apply, not only to the illegal dealings as to the then outstanding tickets, but to like dealings as to similar tickets which might be issued in the future, was but the exertion by the court of its power to restrain the continued commission against the rights of the complainant in the future of a definite character of acts adjudged to be wrongful."

The second answer is that because the defendants' sole business is unlawful and criminal, and there is neither law nor equity to sustain it or protect it, a court of equity may, and should, if necessary to give complete relief to the complainants, absolutely enjoin the conduct of that business by the defendants, including the purchase by it of ores stolen from others as well as from the complainants, and, as the whole is greater than any of its parts and includes them all, it may

lawfully enjoin the conduct of that business until and unless the defendants comply with such regulations respecting the inspection of the stolen ore by the complainants, or their representatives, as will give to the complainants full opportunity to select therefrom and recover the ores stolen from them.

The position that all the mineowners must be parties to the bill and the suit to entitle any of them to such an injunction rests on the assumption, which is not permissible in view of the averment of the bill that the sole business of the defendants is the purchase of these stolen ores, that some of them are engaged in the legitimate business of buying and assaying ore, and in my opinion, in view of this averment of the bill, any mineowner whose ores are stolen by reason of the conduct of the unlawful and criminal business of the defendants may alone, or with others similarly situated, maintain a bill for an injunction against the continuance of this nefarious business by the defendants, or for such less restrictions of it as will give him complete relief.

The objection that the inspection of the stolen ore was by the court delegated to representatives of the complainants does not appear to me to be either novel, unauthorized, or inequitable. It was but the application to this case of the common practice of ordering alleged trespassers upon mines, and other alleged wrongdoers, to permit a constant inspection of their doings by the complainants during the pendency of the suits, to the end that their acts might be known and just redress of the wrongs they were committing could be secured.

The criticism of the injunction that it undertook to establish a line of cleavage between honesty and dishonesty in the conduct of occupations intrinsically lawful and open to pursuit by all seems to me again to disregard the averment that the sole business of the defendants was the purchasing and assaying of ore they knew to be stolen. Mining ore is a legitimate business, but mining another's ore without his consent and converting it to one's use is wrongful, and will be enjoined. Buying and selling railroad tickets was a lawful business open to all, but the business of buying and selling nontransferable tickets was wrongful, and it was enjoined. Letting boats for hire is a lawful business open to all, but the business of letting boats for hire which caused trespasses upon another's property is unlawful, and may be enjoined. In all these cases it is the wrongs of the defendants, and not the injunctions, that cleave them, their acts, and business from legitimate business men, lawful occupations and business, and warrant the injunctions. And in the case at bar it was not in my opinion the injunction, but the defendants' wrongful and injurious acts, their conduct of the sole business of buying, selling, and assaying ore they knew to be stolen ore whereby the workmen of the complainants were caused to steal this ore, that cleft their business and their acts from all legitimate business and acts, and rendered the injunction against them just and equitable.

These complainants bring this suit for themselves and for other owners of mines similarly situated. The fact that some of the latter are citizens of the same state as the defendants is not fatal to the jurisdiction of the court (1) because where parties sue in a representative

character their citizenship alone conditions the jurisdiction of the court and that of the beneficiaries is immaterial (Hotel Co. v. Wade, 97 U. S. 13, 20, 24 L. Ed. 917; Jackson & Sharp Co. v. Burlington & L. R. Co. [C. C.] 29 Fed. 474, 475; Putnam v. Timothy Dry Goods & Carpet Co. [C. C.] 79 Fed. 454; Stewart v. Dunham, 115 U. S. 61, 64, 5 Sup. Ct. 1163, 29 L. Ed. 329; International Trust Co. v. T. B. Townsend Brick & Contracting Co., 95 Fed. 850, 854, 37 C. C. A. 396), and (2) because the controversies between the three complainants and the defendants can be finally adjudicated between them without affecting the rights of the owners of mines similarly situated who are citizens of the same state as the defendants. The latter, therefore, are not indispensable parties to the suit, and, whenever the joinder of a dispensable party would oust the jurisdiction of the court over the parties before it, the suit may proceed without him. Indeed, when such a party has been joined, he may be dismissed, and the suit may still proceed between the other parties. And, after his dismissal, he may intervene and become a party to the suit again without ousting the jurisdiction of the court. Sioux City Terminal R. & W. Co. v. Trust Co. of N. A., 82 Fed. 124, 126, 128, 27 C. C. A. 73, 75, 77; Rogers v. Penobscot Mining Co., 154 Fed. 606, 615, 616, 83 C. C. A. 380, 389, 390; Boatmen's Bank v. Fritzlen, 135 Fed. 650, 658, 68 C. C. A. 288, 296. The bill was not multifarious either because there was a misjoinder of parties or of causes of action. Bitterman v. Louisville & Nashville R. R. Co., 207 U. S. 205, 226, 28 Sup. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693; Hale v. Allinson, 188 U. S. 56, 77, 23 Sup. Ct. 244, 47 L. Ed. 380.

In the consideration and discussion of this case all the averments of the bill have been treated as true (1) because the conclusion of the majority is that the bill states no cause of action in equity, and must be dismissed unless amended, and in the determination of that, the main question in this case, all the allegations of the bill must be treated as admitted, and (2) because in granting the injunction the court below, upon conflicting evidence, decided that the averments of the bill were true and upon that theory granted the injunction, and in such cases appellate courts assume the finding of facts by the trial court to be correct, unless there is clear proof that it fell into a serious mistake in the consideration of the evidence, and no such mistake appears in this case.

For the reasons which have now been stated, perhaps at too much length, the bill seems to me to state a good cause of action for the injunction, and I think the order of the court below granting it should be affirmed.