LOUISVILLE & N. R. CO. v. BITTERMAN et al.

(Circuit Court of Appeals, Fifth Circuit. March 27, 1906.)

No. 1,444.

**1. COURTS—FEDERAL COURTS—JURISDICTION—AMOUNT IN CONTROVERSY.**

In a' suit by a carrier to restrain the scalping of nontransferable round-trip tickets issued at a reduced fare on account of gatherings expected to be largely attended from various parts of the country, the value of the business so sought to be protected determines the amount in controversy for the purpose of determining the jurisdiction of the federal court.

[Ed. Note.—Jurisdiction of Circuit Courts as determined by the amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75; Tennent-Stribling Shoe Co. v. Roper, 36 C. C. A. 459.]

**2. CARRIERS—SALE OF TICKETS—INJUNCTION—ADEQUATE REMEDY AT LAW.**

A carrier is entitled to an injunction to restrain the scalping of nontransferable round-trip tickets issued at a reduced fare on account of public gatherings in different parts of the country; its remedy at law being inadequate, as involving a multiplicity of suits, and because of the difficulty of detecting each offense and ascertaining the pecuniary equivalents for the injury to complainant's business and the inconvenience and annoyances, extra expense, outlays, and risks involved.

**3. SAME—SCOPE OF RELIEF.**

On an application for an injunction by a carrier to restrain scalping of its nontransferable round-trip tickets, it was error for the court to limit complainant's relief to tickets issued, or about to be issued, for particular occasions, and to compel complainant to file a new bill for a special injunction, as each occasion in the conduct of its business with reference to the issue of nontransferable tickets and reduced fares required.

McCormick, Circuit Judge, dissenting.

Appeal and Cross-Appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

See 128 Fed. 176.

The complainant railroad company is a citizen of the state of Kentucky, engaged in the business of operating lines of railroad, upon which are transported passengers between New Orleans and points in this and other states reached by complainant and its connections. The parties defendant to the bill of complaint are a number of individuals, citizens of Louisiana, engaged in the business of what is commonly called "ticket scalping." Three of the defendants, Marcus K. Bitterman, Julius Mehlig, and Charles T. Kelsko. joined in filing responsive pleadings and contesting complainant's right to the relief sought, which was to enjoin defendants, and each of them, and his or their agents, etc., "from buying, selling, dealing in, or soliciting the purchase or sale of any ticket or tickets, or the return coupons or unused portions thereof, issued by orator or by any other railroad company for use over orator's lines of railway, or any part of them, which, by the terms thereof, are nontransferable, or from soliciting, advising, encouraging or procuring any persons other than the original purchasers of such tickets to use, or attempt to use, said tickets for passage on any train or trains of orator, especially, including the nontransferable round-trip tickets issued for use on the occasion of the United Confederate Veterans' Reunion at New Orleans in May, 1903."

The court a quo held that complainant had a legal right to issue reduced rate nontransferable tickets; that defendants, by "scalping" such tickets, were committing wrongful acts, violative of complainant's rights, and causing it irreparable .injury; that the remedy by law was inadequate; and that injunctive relief was the proper remedy. Yet, when it came to the final

decree, it refused to give preventive relief by enjoining defendants generally from "scalping" the reduced rate nontransferable tickets, which complainant was in the business of issuing, and which defendants were admittedly in the business of buying and selling. It confined the relief accorded complainant in the final decree to making perpetual the preliminary injunctions it had rendered during the pendence of the suit; one forbidding the "scalping" of the tickets about to be issued on the occasion of the Confederate Veterans' Reunion in May, 1903, and the other forbidding similar wrongful acts in respect to the tickets about to be issued on the occasion of the Mardi Gras festival of 1904. So much of the relief sought by complainant as related to future issues of nontransferable tickets was denied, without prejudice to its rights to seek such relief by independent proceedings on or before each occasion when it might issue such tickets.

In order to secure a reversal of the ruling that complainant must bring a separate suit for every particular kind of nontransferable ticket it proposes to issue, and a separate suit on every occasion when it proposes to issue any such tickets, the complainant sued out this appeal, assigning the following errors:

"(1) The court erred in refusing to grant to complainant the full injunctive relief prayed for in its bill of complaint, viz., an injunction restraining defendants and each of them, his or their agents, servants, employés, assigns, successor or successors, and all others acting for defendants, or any or either of them, and all persons whomsoever, although not named therein, from and after the time when they severally have knowledge of the existence of such injunction, from buying, selling, dealing in or soliciting the purchase or sale of any ticket or tickets, or the return coupons or unused portion thereof, issued by complainant, or by any other railroad company for use over complainant's lines of railways, or any part of them, which, by the terms thereof, are nontransferable, or from soliciting, advising, encouraging, or procuring any persons, other than the original purchasers of such tickets, to use or attempt to use said tickets for passage on any train or trains of complainant.

"(2) After finding, as it did, that complainant had a right to issue such nontransferable tickets, and that the action of defendants in "scalping" the same was a wrongful and illegal violation of complainant's right, causing it irreparable injury and entitling it to injunctive relief from a court of equity, the court erred in confining the final injunction to two classes of such tickets, and in refusing to give it such preventive relief by injunction as would be coextensive with the right to be protected and the wrong and injury threatened.

"(3) That the court erred in holding that, in order to protect its right to issue said nontransferable tickets from being violated by defendants through the purchase and sale of the same in violation of the terms of the contract embodied in said tickets, complainant must institute a separate suit for injunction on or before every occasion of the exercise of said right.

"(4) The court erred in failing and refusing to include, in the injunctive relief which it granted by said final decree, the case of 'Winter Tourist Tickets,' which the evidence showed were being issued by complainant and were being wrongfully dealt in or 'scalped' by defendants during the pendency of the suit and at the time of the final decree herein."

The defendants have sued out a cross-appeal, and assigned the following errors:

"(1) The court erred in assuming, asserting, and maintaining in this cause, jurisdiction, inasmuch as the amount involved was less than the lowest limit of this court's jurisdiction; and the averments of the bill were fictitious, fraudulent, and colorable, and made for the purpose solely of seizing the jurisdiction of this court.

"(2) That for the cause of complaint, if any exists, as recited in the bill, the complainant has a complete and adequate remedy at law, and cannot, upon recitals of fact traversed by the answer, invoke the equity jurisdiction of the United States Circuit Courts.

"(3) That it is not competent, nor within the power and authority of a chancellor, or of the Circuit Court of the United States, to establish a rule of civil conduct, and, by its judgment and decree, control in advance those

who are charged with being about to breach it and subjecting them to punishment by contempt process, thereby exercising legislative authority and usurping the functions of a co-ordinate department of the government.

"(4) That the right to deal and traffic in railroad tickets, as brokers, is an inalienable right, that being, under the declared policy of the state of Louisiana, a legitimate business; and that any attempt, upon the part of the United States courts by writ of injunction, to deny them the right to conduct the business of ticket brokers, is in violation of the fifth amendment of the Constitution, which guaranties to every citizen protection in the enjoyment of his life, liberty, and property, and of which he cannot be deprived without due process of law.

"(5) That under the bill and answer, in the absence of proof, the case should have been determined as upon the bill and answer; defendants' answer meeting and traversing all the equities of the bill.

"(6) That the court erred in perpetuating the injunctions issued at the times recited in the motion, after its jurisdiction had been by plea and answer challenged, and there was no proof of injury to the complainant.

"(7) That the court refused on final hearing to pass upon the plea to its jurisdiction, and the record fails to show from the evidence administered that any injury whatever was suffered by the complainant by any acts complained of as against these defendants."

Article 1 of the bill of complaint sets forth the organization of complainant under the laws of Kentucky, and its citizenship of that state; its ownership and operation of an extensive system of railways traversing nine states; its connections with other railroads, whereby it reaches all points in the United States, Canada, and Mexico, and transports large numbers of passengers to all parts of the United States, as well as to foreign countries.

Article 2 states that defendants are citizens of the state of Louisiana, and inhabitants of the Eastern district thereof, and are each what is known as a ticket broker, or "scalper," and engaged in the business of buying and selling the unused portions of railroad passenger tickets, especially excursion or special rate tickets issued on occasions of fairs, expositions, conventions and the like; and that defendants have been joined in the suit because their business and transactions complained of are in act, purpose, and effect identical, and in order to prevent a multiplicity of suits, the same relief being sought as to each and all of them.

Articles 3, 4, 5, 6, 7, and 8 relate especially to the United Confederate Veterans' Reunion then about to be held in the city of New Orleans. The bill showed the nature of such annual reunions, the immense attendance thereat, the extensive preparations and arrangements being made therefor, the necessity for special reduced rates of fare to secure a large attendance, complainant's consent, at the request of a local committee of arrangement, to make special rates and to issue special excursion tickets to those desiring to attend the reunion, amounting to a less charge for the trip to New Orleans and return than the regular lawful and reasonable charge one way to New Orleans; the result being that all desiring to attend the reunion and agreeing to observe the conditions attached to the tickets would be carried to New Orleans and return at a cost equivalent to one cent per mile, while the regular rate, except at a few competitive points, was three cents a mile. It was further shown (article 4) that the form of tickets to be used on the occasion in question was a nontransferable, reduced-rate ticket, "issued account U. C. V. Reunion, 1903," good, subject to the conditions printed thereon, for one first-class passage to New Orleans and return, the going trip to begin on date of sale, and the return trip to begin leaving New Orleans not later than May 24, 1903, and extension of the final leaving date being provided for on application of the original purchaser; that among the conditions on the face of the ticket, which ticket contract was signed by the original purchaser and the company, was one that the ticket was nontransferable, and, if presented by any other than the original purchaser, who was required to sign the same at date of purchase, it would not be honored, but would be forfeited, and any agent or conductor of any of the lines over which it read should have the right to take up and cancel the entire ticket, both going and return

portions. A copy of the form of ticket was annexed and made part of the bill.

It is further stated that the attendance upon the reunion would be very large, exceeding 100,000 people, of which fully one-fourth would travel over complainant's lines of railway and make use of the round-trip nontransferable United Confederate Veterans' Reunion tickets; that the large number of people to be carried by complainant on this special occasion had rendered it necessary to issue a ticket, the return portion of which would not have to be signed by the original purchasers, as it would be impracticable to secure such signatures in time to enable the owners thereof to depart when desired, and the same would be a great inconvenience and source of annoyance and expense to the people, for whose benefit such tickets were to be issued; that also, by reason of the large number of persons to be carried on this special occasion, it was wholly impracticable to have the return portions of the tickets presented to any agent of complainant in New Orleans, where the identification of the original purchaser could be properly made; and that it was equally impracticable for the train conductor or collector, while in the management of his train, and in charge of so many passengers thereon, to identify properly persons presenting return portions of such tickets, and at the same time give proper care and attention to the safety and welfare of such passengers and the operation of the train.

It was further alleged that complainant consented to the reduction of rates and provided for the issuance of the said nontransferable tickets in reliance upon being protected from the fraudulent dealings in such tickets by defendants after the issuance thereof, as thereafter set forth, and, unless it was so protected, it could not afford to make the very low rates it had consented to make, and "it cannot afford in the future, on similar occasions of conventions or other assemblies or celebrations in this city, to make reduced rates, on account of the irreparable injury, for which it has no adequate remedy at law, which will be inflicted on it by reason of said fraudulent dealings of defendants."

Article 9 of the bill is as follows: "That defendants, and each of them, are engaged in the business of buying and selling the unused portions of railroad tickets, being commonly called ticket brokers or 'scalpers'; that they are accustomed to buy and sell the return coupons of nontransferable tickets, especially those sold at reduced rates for special occasions, for the express purpose, and no other, of putting them in the hands of purchasers, who will use the same to secure passage on orator's or other railroads by falsely impersonating the original purchaser, falsely and wrongfully signing his name, when such signature is required, falsely stating that he is the original purchaser, and thus by fraud and imposition deceive, impose upon, and defraud orator and other railroad companies to their continuous loss, detriment, and damage; that orator has frequently in the past, as, for example, on the occasion of the Mardi Gras festivals in this city, issued reduced-rate nontransferable round-trip tickets, and the said ticket scalpers have always fraudulently dealt in the return coupons thereof, as above set forth, to the great and irreparable injury of orator's business."

Article 10 declares that complainant is informed and believes, and also knows, from past experience, and so avers, that defendants, and each of them, will, unless restrained by the court, buy and sell the return portions of the United Confederate Veterans' Reunion tickets, and indulge in the same fraudulent practices as charged against them in the preceding article in respect to similar classes of tickets, thus defrauding complainant out of thousands of dollars.

Article 11 shows: "That by reason of the impossibility of preventing or detecting said frauds, as herein set forth, orator will be subjected to constant and frequently repeated losses and irreparable injury (far exceeding the sum of $5,000, exclusive of interest and costs), and such of the public as shall innocently purchase said tickets to pecuniary losses, as well as to great annoyance and humilation."

Article 12 declares that the additional burden cast upon complainant's conductors and collectors of distinguishing the rightful owners of the return portions of such nontransferable tickets from the pretended or fraudulent

holders thereof will inevitably subject complainant to the danger of a multiplicity of suits for damages, where unavoidable errors are made by such conductors and collectors, and will unavoidably subject the public and complainant to great interruption, delay, and much expense in the operation of its trains; that complainant has no means of discovering who the persons are who will so defraud it, by the purchase and use of such tickets, and who would otherwise be compelled to pay the lawful and reasonable one-way rates, which are much higher than the special reduced rates.

Article 13 declares that complainant has no adequate remedy at law against defendants, because of the impossibility of securing evidence, establishing the facts as to said frauds, and, if such evidence could be obtained, it would necessitate a multiplicity of suits, because the injury to its business cannot be estimated or compensated in dollars and cents, and because defendants, and each of them, are financially irresponsible, and no judgments obtained against them at law could be collected on execution; that consequently complainant has no adequate remedy at all against defendants, or any of them, for the frauds which they are about to perpetrate, unless they are restrained by the orders of the court.

Article 14 is as follows: "Orator further shows that at all times it is its custom and usage, and that of its connecting lines, to issue tickets at reduced rates on various occasions to the traveling public, which, by the terms thereof, are not transferable, and constitute a special contract in express terms between orator and the lines issuing the same, all other lines over which the same entitle the holder to travel, and the original purchaser thereof, whereby the said original purchaser agrees that said ticket shall not be transferred by him to any other person."

Article 15 reads as follows: "That the defendants, and each of them, are, and have been for some time, engaged in the business of buying and selling, and dealing in such tickets, and in soliciting and inducing the original purchasers thereof to sell and transfer the same to defendants, or some of them, with the intent and purpose that such tickets shall be used, in violation of the terms thereof, by persons other than the original purchaser, with the full knowledge on the part of the defendants, and each of them, that the same is a fraud upon orator."

Article 16 reads as follows: "That, unless orator has the injunctive relief herein prayed for, it cannot continue to make special reduced rates, as heretofore, on the occasion of conventions, Mardi Gras festivals, and other like occasions, frequently occurring, when it is to the great material interest of this city that large numbers of visitors should attend, which attendance cannot be secured except by the issuance of special nontransferable round-trip tickets as aforesaid."

Article 17 refers to the existence of ticket brokers' associations for the purpose of assisting each other in disposing of nontransferable tickets.

Article 18 alleges that the nature of the business of all ticket brokers, or "scalpers," and the methods of conducting the same, are alike, all making use of the fraudulent devices and misrepresentations, charged in the bill, to dispose of nontransferable tickets, which form a large part of their stock in trade; that they are practically in a combination, or conspiracy, to defraud railroad companies, by inducing, persuading, or misleading the traveling public to sell or buy such nontransferable ticket contracts; that injunctive relief similar to that sought in the bill had been accorded railroad companies by courts sitting in other states of this country, and the ticket brokers have sought to evade the injunction by ostensibly assigning their business to some other ticket broker not named in the order; that, moreover, numbers of scalpers from other places emigrate to the city, where an injunction has been granted and seek to engage in the same business and thus to render valueless the process and orders of the court; that, in order to afford complete and effective relief, the restraining and injunctive orders should be broad enough to include all who knowingly do what the order of the court prohibits defendants from doing, or who aid and abet defendants in violating the injunction or in defeating the object and purpose thereof.

Article 19 states: "That the amount involved in the controversy exceeds, exclusive of interest and costs, the sum of $5,000; that the value of the business which orator seeks to protect and the right which it seeks to have recognized and enforced far exceeds, in the case of each defendant, the sum of $5,000, exclusive of interest and costs."

Article 20 declares that complainant is without adequate or substantial relief in the premises, except by the interposition of a court of equity enjoining and restraining, by its writ of injunction, defendants and each of them, and all other persons, "from doing any of the acts hereinbefore complained of."

Marcus K. Bitterman, Julius Mehlig, and Charles T. Kelsko filed a voluminous joint and several answer to the bill. Their defense is that the court is without jurisdiction, and that defendants have a right to traffic in reduced-rate nontransferable tickets, to buy the same from the original purchasers, and to sell the same to third persons to be used by them for passage on complainant's trains.

The answer admits the organization, citizenship, business connections, etc., of complainant, as set forth in article 1 of the bill.

The averments of the bill in respect to the United Confederate Veterans' Reunion, the large attendance expected, the reduced-rate nontransferable tickets provided for the occasion, etc., are admitted. Paragraph 6 of the answer admits "that the form of the ticket usually provided by complainant and its connections, whenever it makes so-called reduced rates as excursion rates, is substantially the form set out and described in paragraph 6 of the bill of complaint; that said form of ticket purports to contain certain conditions, and purports by the terms thereof to be signed by the original purchaser; that said form of ticket purports and pretends to be nontransferable and to be conditioned that, if presented by other than the original purchaser, who is supposed to sign the same at the date purchased, it will not be honored, but will be forfeited, and said proposed ticket further pretends to be conditioned that any agent or conductor on any of the lines over which it reads shall have the right to take it up and cancel the entire ticket, both the going and return portions of it; and that the form of ticket annexed to the bill of complaint as Exhibit A is the proposed form of ticket to be issued by the complainant and its connections for persons along their lines desiring to attend said reunion of the United Confederate Veterans. It is charged, however, that the ticket conditions are impracticable, never enforced, unenforceable, unlawful, and without consideration, and that the tickets are issued and bought with that understanding; that it ought to make no difference to complainant whether the original purchaser or some third person makes use of the return portions of such tickets.

Paragraph 9 of the answer contains the following admissions: It is admitted that defendants are engaged in the business of buying and selling the unused portions of railroad tickets, or what is commonly known as "ticket brokerage;" and that, in accordance with the general custom of the trade, they buy and sell the return coupons of railway tickets, "whether the same are stamped 'nontransferable' or not, for the reason that the term 'nontransferable' does not import any practical or legal meaning in the business, according to the understanding of the railways themselves, the ticket brokers, and the traveling public to whom said tickets are issued, who freely sell them to brokers, who in turn sell them to other persons desiring to use said tickets for transportation when genuine and bona fide." At the close of the paragraph it is declared that "respondents do not deny" that complainant, on the occasions of the Mardi Gras festivals in New Orleans, issues reduced-rate so-called nontransferable tickets, which tickets are, by common consent and understanding. all treated by the general traveling public, the railways, and the ticket brokers as articles of property negotiable and transferable. And respondents deny fraudulent dealing in such tickets.

In paragraph 10 of the answer, the following admissions are made: "Respondents admit that it is their hope and expectation to buy and sell the return portions of said United Confederate Veterans' Reunion tickets, but they deny that they will solicit, induce, or persuade the holders thereof to sell

such return portions to respondents upon any false or fraudulent pretense or representation upon the part of respondents. Respondents admit that they, in common with the general public, have some knowledge of the character and terms of the proposed tickets; that they are informed and believe that such tickets will be issued at low rates, to induce and enable the traveling public to attend said reunion in large numbers; that respondents expect to offer the same for sale, if they shall acquire any of said tickets, and will sell such tickets to other than the original purchasers, for such price as they are willing to pay; and that it is no concern of the complainant, or its connections, or other railways, whether respondents make a profit or a loss on the proposed dealing in said United Confederate Veterans' Reunion tickets."

The answer denies in various paragraphs that respondents have committed, or intend to commit, any fraud in connection with the "scalping" of nontransferable tickets. It is also denied that complainant will suffer any loss, damage, or injury by reason of the buying and selling of its nontransferable tickets by respondents. They deny the right of complainant to issue nontransferable tickets.

Paragraphs 14 and 15 are as follows:

"Respondents admit that it is the custom and usage of complainant and its connections to issue railroad tickets at reduced rates to the traveling public on various occasions, such as expositions, conventions, Mardi Gras, reunions, or other public gatherings; and that the tickets, which are usually issued by complainant, purport by their terms to be nontransferable, and to constitute a so-called 'special contract' in express terms between complainant, the lines issuing same, all other lines over which the same entitle the holders to travel, and the original purchasers of said tickets, whereby the said original purchasers are forced to agree that said tickets shall not be transferred by them to any other persons. But respondents show that said tickets, when issued by complainant, and its connecting lines, and other railways, on such occasions of expositions, reunions, conventions, Mardi Gras, and the like, are in practice and by general consent and common understanding of the traveling public, the railways, and the ticket brokers, when bona fide and genuine tickets, good for return passage over the lines of said complainant and its connections, and other railways, in the hands of the holders thereof, whether such holders be the original purchasers or not; that such practice and such understanding are common and general all over the United States; that such tickets are sold and dealt in as a legitimate business in every large city, to the knowledge of complainant, and such tickets are, and have been for many years, sold by complainant with full knowledge of the fact that they are in practice and general understanding of the traveling public, good in the hands of any holders."

"Respondents jointly and severally admit that each of them are, and have been for some time, separately engaged in the lawful business of buying, selling, and dealing in such tickets, and in soliciting and inducing the original purchasers thereof to sell and transfer the same to respondents, with the intent and purpose that such tickets shall be used by the second purchaser thereof; but respondents deny that such use is a violation in law or in fact of the terms thereof. And respondents deny any knowledge that such use of said tickets by persons other than the original holders is any fraud upon complainant or the railways issuing such tickets when the same are genuine and bona fide; and respondents again aver that it is a matter of no concern or interest to the complainant, or the railways issuing such tickets, whether the original purchasers are the holders and presenters of the same, or whether the holder has purchased said ticket from the original purchaser, or whether such holder has purchased the same from a ticket broker, or whether, as frequently happens, one of such tickets is accidentally or otherwise exchanged for another of the same class and form."

On December 11, 1903, the complainant filed a general replication to the defendants' answer to the whole bill.

Mr. Ridgely, division passenger agent, testified, among other things, that complainant was in the habit of issuing reduced-rate round-trip nontransferable tickets on the occasion of annual Mardi Gras festivals, and on other

occasions of conventions or large public gatherings in New Orleans; that such tickets contain a contract, signed by the purchaser, that they are not to be transferred, and were issued, as a rule, for one fare for the round-trip, i. e., at one-half of the regular rate of fare. He produced forms of two classes of such reduced-rate nontransferable tickets, which are annually issued by complainant, i. e., Mardi Gras tickets and winter tourist tickets. He testified that the winter tourist tickets were issued every winter in large quantities, and many of such tickets were, at the time he was testifying, outstanding and in use. As to all such reduced-rate nontransferable tickets, the witness declared, from knowledge derived from his experience, that they were being scalped in large numbers by "scalpers," or "ticket brokers;" that complainant had done all it could to prevent this violation of its rights; that in innumerable cases conductors had returned to him tickets which they had taken up because scalped. As to the pecuniary damage or injury to the business of complainant, which it is the object of this suit to prevent, his testimony is as follows: "Q. What can you say as to the amount of pecuniary damage which the Louisville & Nashville Railroad sustains annually from the sale by scalpers of the round-trip nontransferable tickets? A. The scalpers succeed unquestionably in getting a large number of tickets over our line every year, running up into the hundreds, and possibly into the thousands. We have arrived at the conclusion from the large number of tickets our conductors have taken up, and I should judge that the Louisville & Nashville Railroad suffers every year from $15,000 to $18,000, or more, every year. On this division it is almost that amount." George F. Cranmer, a veteran conductor in the employ of complainant, explained the tricks and devices resorted to by ticket scalpers, and those who dealt with them to make use of nontransferable tickets, and the efforts of complainant to prevent such use.

The defendants below took no evidence. On January 23, 1904, defendants filed a joint and several demurrer to the whole bill, on the ground that the bill contained no matter of equity whereon the court could base any decree, or grant any relief to complainant, and that the case sought to be made by complainant was a moot case, and not a real controversy, and did not entitle complainant to any discovery or relief against defendants or any of them. This demurrer was filed without leave of court, after an answer to the whole bill and a general replication, and after the taking of complainant's evidence. The complainant took a rule on defendants to show cause why this demurrer should not be stricken from the files as irregularly filed, after an answer to the whole bill and without leave of court previously obtained, or, in the alternative, to show cause why the demurrer should not be overruled as without merit. After hearing, the court, without passing upon the motion to strike the demurrer from the files, ordered that it be overruled.

Nearly a year after the filing of their answer to the whole bill, after the case had been put at issue and complainant's evidence taken, defendants came into court, and, on suggesting in general terms "that they are now advised that this honorable court is without jurisdiction ratione materiæ to hear and determine this cause, and that appearers desire at this time to formally present for the court's consideration and decision their plea to the jurisdiction of the court, and that, until said plea to the jurisdiction shall have been disposed of by the court's ruling, they ought to be relieved from further defense to the cause upon its merits," obtained an order on complainant to show cause why they should not have leave to file a plea to the jurisdiction, and why, in the meantime, proceedings affecting the merits of the controversy should not be stayed. On hearing, this rule was denied.

In its final decree the court a quo found that the equity in the case was for the complainant and against the defendants, and that complainant was entitled to the relief which it prayed for against the defendants, so far as concerned the tickets covered by the two interlocutory injunctions previously issued, but not as to future issues of such or similar tickets. It was therefore, ordered, adjudged, and decreed that the injunction theretofore issued on the 16th of May, 1903, enjoining defendants from buying, selling, dealing in, or soliciting the purchase or sale of the United Confederate Veterans' Reunion tickets, and that the injunction theretofore issued on February 8, 1904, enjoin-

ing defendants from trafficking in Mardi Gras tickets of February, 1904, be made perpetual. It was further decreed that, as to so much of the relief sought by complainant as related to nontransferable tickets to be issued hereafter, such relief be denied, without prejudice, however, to the right of complainant to seek such relief by independent proceedings on or before each occasion that it may issue such nontransferable tickets.

George Denegre and Joseph Paxton Blair, for appellant.

Henry L. Lazarus, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts). We have given rather a full statement of the case to show that no important phase of it has escaped our attention. The right of the Louisville & Nashville Railroad Company, as a common carrier of passengers for hire, to issue round trip excursion and tourist tickets at reduced rates is incontestable; and this right is in and for the public interest and profit, and is of great value to the company. In issuing such tickets, in order to prevent imposition and fraud and prevent injury to its regular passenger business, the company has the right to contract with a person availing himself of reduced rates for identification of the person to whom the particular ticket is issued, and that the ticket issued shall not be transferable, but shall be void in the hands of another person than the one to whom issued. See Moshar v. Railway Co., 127 U. S. 390, 8 Sup. Ct. 1324, 32 L. Ed. 249; Boylan v. Hot Springs, etc., Co., 132 U. S. 146, 10 Sup. 50, 33 L. Ed. 290.

The case shows that on complainant's and appellant's great system, running through some nine states, with railroad connections in all directions, this line of business is of great dimensions and continuous transaction, and that the complainant has been from time to time issuing, and will be required from time to time to issue, and will issue, such tickets for reduced rates with special provisions for identification and nontransfer. The defendants and appellees are charged with buying and procuring the specially reduced-rate tickets of the company from persons who have no right to sell or transfer them, and then with selling or delivering them to persons traveling over the company's lines, who have no right to avail themselves of the reduced rates, and who, by tendering the said void tickets to the agents of the company and availing themselves of the same, perpetrate a fraud on the company, injuring it in its legitimate business and putting the company to large expenses and outlays. And the defendants insist that they expect to continue and will continue to buy and sell and deal in the said nontransferable tickets. It is too plain for argument that the admitted dealings by the defendants in the nontransferable tickets of the company is a great injury to the company and a fraud on the uninformed persons induced to buy the same, and that, with those informed persons who buy such tickets from the defendants to use in traveling over the company's lines, the defendants are accessory to the proposed fraud. It would be a waste of time and words to elaborately set forth in this opinion the arguments and authorities showing that the business of the defendants, as outlined above, is illegitimate and contrary to equity and good conscience.

The main and only important objection to granting relief to the company, under the bill filed in the Circuit Court, is that the court is without jurisdiction. This objection, as set forth in the answer, the demurrer, or the motion to file plea under section 5 of Act March 3, 1875, c. 137, 18 Stat. 472 [U. S. Comp. St. 1901, p. 511], is based on the proposition that the amount involved does not exceed $2,000, exclusive of interest and costs. We have seen that the complainant is carrying on a legitimate line of business of great extent, and that the defendants are and will continue depredating, infringing, and injuring the complainant in said business, contrary to right and equity. The value of this line of business must necessarily be many times greater than the sum of $2,000. We should do violence to common sense, if, under the established facts of this case, we permitted ourselves to doubt it. The actual injury measured in dollars that the defendants have inflicted, and if unhindered will inflict, depends upon the number of void tickets passing through their hands successfully imposed on the agents of the complainant, and the amount the complainant may be compelled to expend for additional guards, conductors, and inspectors to prevent the frauds resulting from the defendants' free hand in their illegitimate dealings. The bill shows that, at the time it was filed, enormous crowds of people were about to attend the United Confederate Veterans' Reunion at New Orleans, thousands of whom would travel over complainant's lines upon such reduced-rate nontransferable tickets. One of the objects of this bill was to prevent the scalping of this large issue of United Confederate Veterans' Reunion tickets. The defendants admitted complainant's allegations in respect to the thousands of tickets to be issued and the large number who would travel thereon, and admitted their intention to buy and sell the same in disregard of the terms thereof. It was alleged that complainant would thus be defrauded of thousands of dollars, and that, by reason of the impossibility of detecting and preventing the sale and resale of such nontransferable tickets, complainant would be subjected to constant and frequently repeated losses and irreparable injury far exceeding the sum of $5,000, exclusive of interest and costs.

It was further alleged that complainant was in the habit or business of issuing such reduced-rate nontransferable tickets on the frequently occurring occasions of conventions and other like events bringing large concourses of people to New Orleans, as well as on the occasions of the annual Mardi Gras festivals, and that defendants were engaged in the business of inflicting great loss and irreparable injury upon complainant by soliciting and inducing the original purchasers of such tickets to sell the same to defendants, who disposed of them to other persons to be used for passage on the trains of complainant. These allegations are substantially admitted in the answer. The bill alleges:

"That the amount involved in this controversy exceeds, exclusive of interest and costs, the sum of $5,000: that the value of the business which orator seeks to protect, and the rights which it seeks to have recognized and enforced, exceeds in the case of each defendant the sum of $5,000, exclusive of interest and costs."

The uncontradicted evidence of Ridgely, in charge of the New Orleans division of the complainant is:

"The scalpers succeed unquestionably in getting a large number of tickets over our line every year, running up into the hundreds, and possibly into the thousands. We have arrived at the conclusion, from the large number of tickets our conductors have taken up, and I should judge that the Louisville & Nashville Railroad suffers every year from $15,000 to $18,000 or more every year. On this division it is almost that amount."

In Nashville, C. & St. L. Ry. Co. v. McConnell (C. C.) 82 Fed. 72, involving the matter of enjoining "scalpers" of reduced-rate round-trip tickets and where the jurisdictional amount in controversy was denied, Judge Clark held:

"A preliminary question is made on the jurisdiction of this court in respect of the amount or matter in controversy. Although this question is not first presented in argument, it must first be determined in ruling on the cases; for, if this court is without jurisdiction, it is not within its province to determine the other questions raised. The contention is that these bills are substantially suits upon the ticket contracts, to recover damages for a violation thereof, or for specific execution thereof, and that the right of action is separate upon each ticket, and that such rights or claims cannot be joined together in this suit so as to make an amount that gives jurisdiction. It is agreed, in order to save a larger accumulation of costs, that, if the court entertains the opinion that there is jurisdiction against each defendant in a separate suit, no objection will be urged against entertaining suits against the defendants jointly. From what has been said, it will readily be seen that, in my opinion, these are in no just sense suits upon the contract, nor for specific performance, but are suits to protect the business of the complainants against the irreparable mischief being suffered by reason of the fraudulent use and abuse of these ticket contracts; and the amount or value of the matter in controversy is not the damage that might be specifically recovered in a suit upon any or more of these contracts, but is the protection furnished to the plaintiffs, and the loss prevented by the fraudulent use of any and all of these void papers. It is the value of the whole object of the suit to the complainant which determines the amount in controversy. In Railroad Co. v. Ward, 2 Black, 485, 17 L. Ed. 311, bill was brought to abate a public nuisance, and it was held that the true test of jurisdiction as to the amount was the value of the object to be gained by the bill, which object was the removal of the nuisance complained of. So, also, in Railway Co. v. Kuteman, 4 C. C. A. 508, 54 Fed. 552, the suit was by a railroad company for an injunction to restrain a shipper from prosecuting in the state courts a multiplicity of suits for overcharge in freight; the question being over the right of the company to maintain a schedule rate under which the charges were made. And the court held that the true test of the jurisdictional amount was the value of the right to maintain the rate, and not the particular sums involved in the separate suits. The exact language of the court is: 'In a suit for an injunction the amount in dispute is the value of the object to be gained by the bill. Fost. Fed. Prac. § 16. An injunction may be of much greater value to the complainant than the amount in controversy in cases of dispute which have already arisen. Symonds v. Greene (C. C.) 28 Fed. 834; Whitman v. Hubbell (C. C.) 30 Fed. 81. The maintenance of its rates is the real subject of dispute, and the object of the bill and the value of this object must be considered. Railroad Co. v. Ward, 2 Black, 485, 17 L. Ed. 311. This value not being liquidated or fixed by law, the alleged value, especially on demurrer to the bill, must govern.' In Smith v. Bivens (C. C.) 56 Fed. 352, the bill for injunction was by the owner of a large body of land, valuable only for its pasturage rights and privileges, to protect that right from use by cattle and stock owners, neighbors of the land of complainant, under authority of an act of the Legislature of South Carolina changing the previous law, which required owners of cattle and stock to keep them fenced in so as to exempt plaintiff's land, with other lands, from the operation of the act. The court held

that the true test of the jurisdiction was the value of the entire pasturage right of the complainant, which was to be protected, and not the amount as between the complainant and any one of the cattle owners proposing to use this right without compensation. Judge Simonton observed: 'The case comes within Railroad Co. v. Ward, 2 Black, 492, 17 L. Ed. 311, or as it is stated in Railway Co. v. Kuteman, 4 C. C. A. 503, 54 Fed. 552, in a suit for an injunction, the amount in dispute is the value of the object to be gained by the bill.' "

On the reasoning and authorities as given by Judge Clark, and particularly on our own holding in Texas & Pacific v. Kuteman, 54 Fed. 552, 4 C. C. A. 503, we are constrained to hold that, on the facts pleaded and proved in this case, the amount or value in controversy exceeds the sum of $2,000, exclusive of interest and costs.

The defendants contended in the lower court, and learned counsel in elaborate brief here contends, that, for the wrongs to its business to be perpetrated by the defendants, the complainant has a complete and adequate remedy at law. Counsel cites a large number of adjudged cases wherein relief in equity was denied, because the remedy at law was plain, adequate, full, and complete; but, although well decided, these cases furnish us no assistance. In the matter of the defendants' illegitimate, mischievous, and fraudulent acts done and threatened, it would tax the ingenuity of counsel to point out any plain remedy at law, and would be impossible to point out any remedy at law in any sense measuring out to the complainant complete and adequate relief.

In Pomeroy's Equitable Remedies, vol. 2, § 634, the matter of injunctions against frauds on contractual rights is discussed, with the conclusion in regard to remedies against "scalpers," that remedies at law are inadequate and injunctions proper. Cases relied upon are cited in footnote, and of so late date as to include Judge Parlange's decision in the Circuit Court in the case now under review.

In Angle v. Chicago, St. Paul, etc., Railway Co., 151 U. S. 1, 3, 14 Sup. Ct. 240, 38 L. Ed. 55, the court says:

"It has been repeatedly held that, if one maliciously interferes in a contract between two parties, and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer."

And see Flaccus v. Smith, 199 Pa. 128, 48 Atl. 894, 54 L. R. A. 640, 85 Am. St. Rep. 779, and Raymond v. Yarrington (Tex. Sup.) 73 S. W. 800, 62 L. R. A. 962.

This doctrine is applicable to the case of a ticket scalper who induces, assists, and enables the purchaser of a nontransferable railroad ticket to transfer the same with a view to the ultimate sale of the nontransferable ticket to some person not entitled to use the same.

That the defendants to the bill filed in the court below have repeatedly interfered and procured the violation of complainant's contract, and propose to continue in the same line of action, is fully shown in the pleadings and proof in the transcript. The remedy at law is plainly inadequate, because not only involving a multiplicity of suits, but because of the difficulty of detecting each offense and of ascertaining pecuniary equivalents for the injury done to complainant's business and for the inconveniences, annoyances, extra expense, outlays, and risks

involved in the matter. The case therefore shows an actionable wrong of a recurrent and continuing nature, and, to prevent the same, the complainant is entitled to an injunction. We think, further, that on the case made in the bill the injunction should be permanent, and we do not perceive the necessity or propriety of driving the complainant to file a bill for a special injunction on every occasion which it finds necessary in the conduct of its business to issue nontransferable tickets at reduced rates. A court of equity having jurisdiction of the parties and subject-matter should, in its final decree, administer full relief. See Pom. Eq. Jur. vol. 1, § 242. We find none of the errors assigned on the cross-appeal well taken.

The cause is remanded to the Circuit Court, with instructions to enter a decree in accordance with the views herein expressed, the costs of the appeal and the cross-appeal to be paid by the defendants.

McCORMICK, Circuit Judge (dissenting). I cannot concur in the judgment of the court in this case. I think the decree appealed from should be reversed, and the suit dismissed for want of equity in the bill. Moreover, as I read the record, there is no substantive averment or proof of damage incurred or threatened of any amount in value, or, at most, of only nominal amount. The damages, if any are shown, are sentimental.