GOLDFIELD CONSOL. MINES CO. et al. v. RICHARDSON et al.

(Circuit Court, D. Nevada. February 1, 1911.)

No. 1,104.

1. INJUNCTION (§ 103*)—EQUITABLE RELIEF—RESTRAINING CRIMINAL OFFENSE —RECEIVING STOLEN ORES.

Where defendants, who pretended to be assayers in a mining district, had purchased large quantities of ore which had been taken from complainants' mines through innumerable thefts committed by their employés with such secret and cunning as to outwit all watching and precaution, complainants had no adequate remedy at law, and were entitled to maintain a suit in equity to restrain defendants from continuing to purchase ore so stolen, notwithstanding such purchase constituted a crime.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 176, 177; Dec. Dig. § 103.*]

2. INJUNCTION (§ 114*)—PARTIES—JOINDER.

Where complainants, who were owners of mines in severalty in a certain district, had long suffered from petty thefts of ore by their employés who had sold the same to defendants, who pretended to be assayers in the district, and a suit to restrain defendants' further purchase of ores, under such circumstances, involved the same question as against all the defendants, complainants were all entitled to join in a single complaint against all the defendants so charged, though there was no concert of action among the defendants in their various purchases, each acting separately for his own benefit.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 202–220; Dec. Dig. § 114.*]

In Equity. Suit by the Goldfield Consolidated Mines Company and others to restrain George Richardson and others from purchasing gold ore stolen from complainants' mines. On application for restraining order pendente lite. Granted.

W. H. Bryant, for complainants.

Robert L. Hubbard, for respondents.

FARRINGTON, District Judge. It appears from the bill that each complainant owns valuable gold mines in Goldfield Mining District, Esmeralda county, Nev. These mines join, and form one continuous tract of about 473 acres. Running through this land are a number of veins rich in ores, valued at from 50 cents to several dollars per pound. This ore is of a "peculiar nature, and readily distinguishable from all other ores" found in the district or elsewhere in Nevada; the distinguishing characteristics are alleged to be well known to each defendant. Each complainant has a large number of employés engaged in working these properties. In spite of every precaution some of these employés from time to time steal ore in varying quantities, usually small, and carry it out of the mines when they quit work. It is further alleged that "the respondents are engaged in the pretended business of operating assay offices in the town of Goldfield, but, as a matter of fact, they do not operate assay offices, but mere fences, where the employés of the complainants sell and dispose of the ore stolen from employers; that prior to the bringing of this suit several million dollars' worth of ore had been stolen in this way

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

from the complainants; that said thefts, at one time, were carried on much more extensively than at present, but that during the year 1909, notwithstanding all the precautions plaintiffs could adopt, their employés have taken not less than $160,000 worth of ore, and sold and disposed of the same to the respondents; that the complainants are the producers of all the high grade ore produced in the Goldfield district, and all high grade ore bought by the respondents has been stolen from one or the other of the complainants, which fact is well known to said respondents; that the sums taken by each employé and sold are small in amount, and it is difficult, if not impossible, to detect them in the taking or the sale to the respondents; that the expense of bringing a multitude of suits for each individual offense would be far beyond any recovery that might be had; that the respondents threaten to continue in their business and will continue to purchase ore from employés of the plaintiffs; that there is no other remedy save and except a bill in equity to enjoin the respondents from carrying on their pretended business of assaying, and to enjoin them from purchasing any ores stolen from the complainants' property."

Pending the hearing of complainants' application for an injunction pendente lite, it was ordered that defendants should not purchase any ore without first notifying complainants, or some one of them, thus affording an opportunity to examine and inspect the ore offered. In due time all the respondents except W. F. Lautzenheiser, H. T. Lautzenheiser, and E. R. Wick appeared and demurred to the bill. Want of equity and misjoinder of parties, both plaintiff and defendant, are the objections urged in each demurrer.

In support of the application for an interlocutory injunction, testimony was offered to show that for two years prior to the suit practically all ore mined and produced in Goldfield district came from properties owned by complainants. The only other producing mine in the district was the Daisy from which the shipments were small, and, as a rule, low grade. Inconsiderable quantities of ore had also been taken from the Black Butte, Belmont, Gold Bar, and Great Bend. Ores mined by complainants, save occasional lots shipped to smelters, are treated in mills at Goldfield operated by complainants themselves. Large quantities of ore were stolen from the complainant companies by their employés. The thefts were frequent, but the amount taken in each case was usually small. This practice has continued, despite all efforts to check it. Prior to this suit, and in the year 1909, the several respondents shipped out of Goldfield through different agencies, in the neighborhood of $100,000 worth of bullion as follows, to wit:

| | |
|---|---|
| George Richardson, between January 9th and November 2d, inclusive | $67,849 46 |
| M. J. Smith, between January 11th and September 23d, inclusive | 8,476 64 |
| John Pankey, between January 23d and July 8th, inclusive | 1,313 69 |
| Daniel Lane, between June 2d and September 7th, inclusive | 6,241 38 |
| Carlton Aguilar, between June 11th and September 23d, inclusive | 3,849 29 |
| Alfred Held and A. M. Schwalbach, between January 16th and October 11th, inclusive | 12,740 78 |
| Charles Robb, George Rumsey, and Joseph Gruebecker, between January 5th and October 1st, inclusive | 6,736 44 |

The respondents admit purchasing ore, but each, except Mr. Smith and Mr. Held, declares that he never purchased any ore which he knew had been stolen. Mr. Smith states positively that he never bought any stolen ore, and so does Mr. Held, but elsewhere in the affidavit of each is the statement that he never knowingly bought stolen ore.

Much testimony has been offered tending to show that complainants' ores have a characteristic appearance by which they may be readily distinguished. This respondents deny. They testify that complainants' ores can only be distinguished from other ores by microscopical examination or chemical analysis. Each respondent also testifies that he has conducted a legitimate business, openly and without secrecy; that he had fully complied with the Nevada statute of March 29, 1907, which requires a record to be kept of all ore purchased; and also that none of complainants have ever attempted to examine such record. Each defendant declares that he has no secret understanding or agreement with either or any of his codefendants in relation to the purchase or shipment of bullion. I conclude from the testimony that a large part of the bullion disposed of by respondents in 1909 was obtained from ores taken out of complainants' mines. No ore during that time was purchased by either or any of them from complainant companies, or from the Daisy Mining Company, or from any authorized agent of any of said companies.

The evidence convinces me that complainants' ores were stolen; that defendants purchased ore which could have come from no other source than complainants' mines, and through the hands of dishonest employés; and, while it may be necessary to submit Goldfield ores to a chemical analysis or microscopical examination to determine their source with absolute certainty, still complainants' ores have an individuality sufficient to put an experienced dealer in ores of that district on his guard.

[1] It is not clear that any defendant purchased any particular lot of ore knowing positively at the time that it had been stolen, nor is it likely that any one of respondents actually witnessed such a theft. Possibly accurate, positive knowledge was avoided when the circumstances were such as to arouse suspicion. However, after considering and reconsidering all the testimony, I am forced to the conclusion that defendants could not have acquired all of complainants' ores which came into their possession innocently. The facts certainly justified the issuance of the temporary restraining order, and fully warrant its continuance pending the suit, unless the demurrers are well founded. Every person who, for his own gain, receives or purchases ore, knowing it to have been obtained by embezzlement or larceny, is, under the Nevada statute, guilty of a crime. Upon conviction he may be imprisoned for a term not exceeding five years, or by a fine not exceeding $1,000, or by both such fine and imprisonment. He cannot, however, be confined in the state prison unless the value of the property stolen is $50 or more; if the value is less than $50, he will be punished as provided in cases of petit larceny. This fact does not prevent complainants whose ores have been lost through

innumerable petty thefts committed by their employés, with secrecy and cunning sufficient to outwit all watchfulness and precaution, from invoking the aid of a court of equity to suppress the business of purchasing such stolen ores. True, a court of equity is in no sense a court of criminal jurisdiction; but, nevertheless, such a court has the undoubted right to interfere by injunction where property rights are threatened with irreparable injury, for which there is no adequate redress in a court of law. In such cases the only function of equity is the protection of property; it does not interfere with the enforcement of the criminal law. Criminal prosecution is not designed to redress private wrongs; it cannot restore to complainants any equivalent for the lost ores. A familiar application of this principle is seen when the powers of such a court are exerted to prevent acts of criminal violence in the course of labor troubles. The injunction is issued, not because the acts are criminal, but because they are destructive of property rights. In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092; High on Injunction, § 1415h; Fetter on Equity, p. 9; Nashville, etc., Ry. Co. v. McConnell (C. C.) 82 Fed. 65, 87; People v. Tool et al., 35 Colo. 225, 86 Pac. 224, 229, 231, 6 L. R. A. (N. S.) 822, 117 Am. St. Rep. 198; Hamilton Brown Shoe Co. v. Saxey, 131 Mo. 212, 32 S. W. 1106, 52 Am. St. Rep. 622, 626.

Some four years ago the Goldfield Mohawk Mining Company filed a bill in this court in which it was stated that the defendants had in their employ a large force of miners engaged in the extraction of ores from property in Goldfield leased by the complainant to the defendants; that the miners were stealing ore; and that defendants had not and would not take proper precautions to prevent the practice. Judge Morrow promptly enjoined the defendants, and their servants, agents, employés and workmen, from removing any ore clandestinely from the mines, and authorized complainant to send watchers into the mines to see that the order was obeyed. It is unnecessary to multiply authorities in support of this proposition. A court of equity has the power in a proper case to enjoin acts which are destructive of property rights, even though the acts in themselves are criminal. And the perpetrator cannot be heard to say when he is indicted therefor that he has already been punished for disobeying the injunction prohibiting the act. The power of a court of equity begins where the jurisdiction of the courts of law ends. Where the latter can afford adequate relief, the former will not interfere.

It is urged that, on the allegations of the bill, complainants are entitled to no equitable relief, because legal remedies are adequate; that is, they are fitted and adapted to the end in view. If each miner who steals ore were known, and his thievish propensities clearly and plainly established, all could be discharged, and the trouble thus ended. But it is shown that these thefts are numerous and difficult of detection; that each theft is small in amount and carefully concealed. Complainants cannot well discharge all their employés—the innocent and the guilty together. Obviously, much time would be consumed, many thefts successfully perpetrated, and large quantities of ore stolen before those who steal could be detected. High-grading is a very

common practice in every mining camp where ores are rich. Furthermore, new men who replace those discharged may not all be honest. If this remedy alone were resorted to, complainants' losses would inevitably be large and irreparable. The same would be true if complainants sought to recover from their dishonest employés the stolen ore, or its value, in actions at law. It is obvious in such event there would be innumerable suits, inability to procure testimony, judgments against insolvent persons, and other difficulties too numerous to mention.

The defendants here did not steal the ore. They simply provided a market for stolen ore. But the mere presence of such places where stolen ore can be disposed of is an incentive to larceny, and pro tanto a menace to complainants' rights. Purchasing the stolen ore is as clearly and distinctly a wrong as the original theft. Notwithstanding it is purchased by a so-called assay office, ore is still the property of the owner from whom it was stolen, and he may recover it, or its value, in an action at law. But if this course were pursued and an action at law had for each wrong, the result would be a multitude of suits, involving expenses probably in excess of the value of the recoveries, as well as many unsurmountable difficulties in procuring testimony. Clearly the legal remedies are inadequate, and in no just sense can they afford the relief to which complainants are entitled.

"Indeed, as has been, in substance, said in other cases, the very fact that a right has been violated, and that this violation is constantly going on, and that a court of law cannot, in damages, compensate the injury or stop the wrong, furnishes the best possible reason for interference by court of equity, and the fact that an actual injury resulting from the violation of a right is small, and the interest to be affected by an injunction large, is not to weigh against the interposition of preventive power in equity, when it is clear that on one hand a right is violated, and on the other a wrong committed." Nashville, etc., Ry. Co. v. McConnell (C. C.) 82 Fed. 65, 70.

In Parker v. Woolen Co., 2 Black, 551, 17 L. Ed. 333, it is said that equity will—

"give its aid to prevent oppressive and interminable litigation, or a multiplicity of suits, or where the injury is of such a nature that it cannot be adequately compensated by damages at law, or is such as, from its continuance or permanent mischief, must occasion a constantly recurring grievance which cannot be prevented otherwise than by an injunction."

In Board of Trade v. Christie & Company, 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, it appeared that the Chicago Board of Trade as a portion of its business regularly collected and distributed to certain patrons quotations of prices offered and accepted on its exchange. These quotations the defendant, in some undisclosed, but necessarily wrongful way, had obtained, and was engaged in publishing. The Supreme Court held that these quotations were property, and that the Board of Trade was entitled to an injunction restraining the defendant from using or distributing them.

In the case of Mills v. New Orleans Seed Company, 65 Miss. 391, 4 South. 298, 7 Am. St. Rep. 671, the parties were rivals in the business of buying, collecting, and crushing cotton seed. It was plaintiff's custom to distribute his sacks at railroad stations and river land-

ings, where they could be found and filled by his patrons. The defendant was in the habit of taking these sacks and using them in its own business. Many were thus lost or destroyed. Plaintiff asked a perpetual injunction restraining defendant from further use of the sacks; that defendant be compelled to account for and deliver up all of complainants' sacks in its possession; to pay for all injury to said sacks; and also to pay over all profit derived from their use. On appeal from an order overruling the demurrer to this petition, the Supreme Court said:

"The separate remedy at law for each of such trespasses would not be adequate to relieve the injured party from the expense, vexation, and oppression of numerous suits against the same wrongdoing in regard to the same subject-matter. The ends of justice require in such case that the whole wrong shall be arrested and concluded by a single proceeding. And such relief equity affords and thereby fulfills its proper mission of supplying the deficiencies of legal remedies."

In the so-called ticket scalping cases, the courts have repeatedly applied the rule which is illustrated in the above cases. For instance, in Bitterman v. Louisville & Nashville R. Co., 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171, the Circuit Court of the United States for the Eastern district of Louisiana, had entered a decree perpetually enjoining Bitterman and certain other brokers who were engaged in the business of ticket scalping in the city of New Orleans, from dealing in nontransferable round trip tickets issued at reduced rates for passage over complainant's lines. It was charged in the bill that defendants were engaged in buying such tickets from persons who had no right to sell or transfer them, and in selling such tickets to persons who had no right to travel over complainant's lines at reduced rates; and that the purchaser by tendering them, perpetrated a fraud upon the railroad company, put it to large outlays, and injured its legitimate business. The Court of Appeals (144 Fed. 34, 45, 75 C. C. A. 192, 203), after declaring defendants' business to be illegitimate and contrary to equity and good morals, said:

"The remedy at law is plainly inadequate, because not only involving a multiplicity of suits, but because of the difficulty of detecting each offense and of ascertaining pecuniary equivalents for the injury done to complainant's business and for the inconveniences, annoyances, extra expense, outlays, and risks involved in the matter. The case therefore shows an actionable wrong of a recurrent and continuing nature, and, to prevent the same, the complainant is entitled to an injunction. We think, further, that on the case made in the bill, the injunction should be permanent, and we do not perceive the necessity or propriety of driving the complainant to file a bill for a special injunction on every occasion which it finds necessary in the conduct of its business to issue nontransferable tickets at reduced rates. A court of equity having jurisdiction of the parties and subject-matter should, in its final decree, administer full relief."

The decision of the lower court was subsequently affirmed in the Supreme Court of the United States, where it was held that the character of the tickets, the number of persons to whom they were issued; the dealings of the defendants therein; their purpose to continue such dealings; the risk to result from enforcing the forfeiture provisions in the ticket; and the multiplicity of suits necessarily to be engendered, if redress is sought at law—established the inadequacy of the

legal remedy, and the necessity. for the intervention of a court of equity. To the same effect see: Nashville, etc., Ry. Co. v. McConnell (C. C.) 82 Fed. 65; Ill. Cent. R. Co. v. Caffrey (C. C.) 128 Fed. 770; Louisville N. R. Co. v. Bitterman (C. C.) 128 Fed. 176; Schubach v. McDonald, 179 Mo. 163, 78 S. W. 1020, 65 L. R. A. 136, 101 Am. St. Rep. 452; Sperry & Hutchinson Co. v. Mechanics' Clothing Co. (C. C.) 128 Fed. 800; Id. (C. C.) 135 Fed. 833; Blondell v. Consolidated Gas Co., 89 Md. 732, 43 Atl. 817, 46 L. R. A. 187.

If there is a misjoinder of parties plaintiff and defendant, the equitable relief sought in this proceeding cannot be obtained in less than 20 suits. Bills must be filed by each complainant against each defendant; each suit will involve the same question, present substantially the same issues, and demand the same injunctive relief. The convenience of court and litigants demands that this controversy shall be determined in one suit, if one decree can be made which will do entire justice to all parties, without jeopardizing any substantial rights.

"Each case," says Mr. Justice Peckham in Hale v. Allinson, 188 U. S. 56, 23 Sup. Ct. 244, 47 L. Ed. 380, "if not brought directly within the principle of some preceding case, must, as we think, be decided upon its own merits and upon a survey of the real and substantial convenience of all parties, the adequacy of the legal remedy, the situations of the different parties, the points to be contested and the result. which would follow if jurisdiction should be assumed or denied; these various matters being factors to be taken into consideration upon the question of equitable jurisdiction on this ground, and whether within reasonable and fair grounds the suit is calculated to be in truth one which will practically prevent a multiplicity of litigation, and will be an actual convenience to all parties, and will not unreasonably overlook or obstruct the material interests of any."

In each of the next-cited cases, on petition of a single complainant, a number of ticket brokers were enjoined from dealing in nontransferable railroad tickets. Each defendant was engaged in procuring such tickets from persons who, under their contract with the railroad company, had no right to sell; and in procuring other persons to purchase such tickets, and falsely personate the original purchaser, and thus obtain transportation at less than ordinary rates.

[2] There was no connection between the defendants, or privity between them and the complainant. It was simply an independent business, carried on by each defendant, like the business conducted by every other defendant. The injurious acts were of the same character; the effect of each upon complainant's rights was identical. The same relief was asked against each defendant. Although defendants were severally liable, it was held that the bill was not multifarious, because the joinder would avoid a multiplicity of suits, and because all the defendants were engaged in the same business, and had a common ground of defense in law and in fact against the relief demanded. Illinois Cent. R. Co. v. Caffrey et al. (C. C.) 128 Fed. 770; Pennsylvania Co. v. Bay et al. (C. C.) 150 Fed. 770; Louisville & N. R. Co. v. Bitterman, 144 Fed. 34, 75 C. C. A. 192; Id., 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171.

In volume 1 of Pomeroy's Eq. Jurisp., at section 269, the rule is thus stated:

"The jurisdiction, based upon the prevention of a multiplicity of suits, has long been extended to other cases of the third and fourth classes, which are not technically 'bills of peace,' but 'are analogous to' or 'within the principle of' such bills. Under the greatest diversity of circumstances, and the greatest variety of claims arising from unauthorized public acts, private tortious acts, invasion of property rights, violation of contract obligations, and notwithstanding the positive denials by some American courts, the weight of authority is simply overwhelming that the jurisdiction may and should be exercised, either on behalf of a numerous body of separate claimants against a single party, or on behalf of a single party against such a numerous body, although there is no 'common title,' nor 'community of right' or of 'interest in the subject-matter,' among these individuals, but where there is and because there is merely a community of interest among them in the question of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body. In a majority of the decided cases, this community of interests in the question at issue and in the kind of relief sought has originated from the fact that the separate claims of all the individuals composing the body arose by means of the same unauthorized, unlawful, or illegal act or proceeding. Even this external feature of unity, however, has not always existed, and is not deemed essential. Courts of the highest standing and ability have repeatedly interfered and exercised this jurisdiction, where the individual claims were not only legally separate, but were separate in time, and each arose from an entirely separate and distinct transaction, simply because there was a community of interest among all the claimants in the question at issue and in the remedy. The same overwhelming weight of authority effectually disposes of the rule laid down by some judges as a test, that equity will never exercise its jurisdiction to prevent a multiplicity of suits, unless the plaintiff, or each of the plaintiffs, is himself the person, who would necessarily, and contrary to his own will, be exposed to numerous actions or vexatious litigation. This position is opposed to the whole course of decision in suits of the third and fourth classes from the earliest period down to the present time. While the foregoing conclusions are supported by the great weight of judicial authority, they are, in my opinion, no less clearly sustained by principle."

In Illinois Cent. R. R. Co. v. Caffrey, supra, Judge Thayer concludes a carefully written opinion with these words:

"It may be conceded that persons ought not to be called upon to make a defense to actions against third parties, when the cause of action is one with which they have no concern, and where they are in the attitude of idle spectators of the controversy; but where the cause of action is one in which they have an immediate interest, because a like cause of action exists against themselves, to which they make the same defense as others will make, and by joining them with others the convenience of everybody, including the court, is subserved, and the rights of every one may be safeguarded and valuable time saved, no reason is perceived why they may not be joined, there being no hard and fast rule of law which forbids. Such is the case at bar. The defendants have a common interest in the question to be litigated, and it is desirable that they should be heard and determined in a single trial."

In the present case the rights of each complainant have been violated repeatedly. The violation is constantly recurring, and will continue as long as either or any of the defendants remain in their present business. Every wrongful act complained of is precisely like every other. The operation and effect of each act upon complainants' rights is identical. The injunctive relief sought against each defendant is the same, and the defenses thus far suggested are common to all the defendants, and involve like legal questions. Each

affidavit so far filed in behalf of the several defendants states that each is engaged in a lawful business; that he purchases ore, but does not know that any of it was stolen. The rule followed in the cases above cited seems to me to have in its favor the weight of authority. Under that rule the demurrer cannot be sustained on the ground of misjoinder of defendants. The same reasoning and the same authorities which permit the joinder of defendants in this bill favor and support the view that complainants may also be united. Although they own their own properties in severalty, and have distinct interests, still they have a common concern in the relief sought, to wit, in the suppression of the business of receiving and purchasing stolen ores.

The situation here is analogous to that which is presented when a number of persons file a bill to abate a nuisance. They are not only permitted to unite against one defendant whose business is harmful in like manner to each complainant; but they may in the same bill join as defendants a number of persons, each of whom conducts the same kind of objectionable business, the effect of which upon the rights of complainants is identical, save in the amount of injury inflicted. An illustration of this is afforded in American Smelting & Refining Co. et al. v. Godfrey et al., 158 Fed. 225, 89 C. C. A. 139: In that suit there were 409 complainants, farmers owning in severalty as many tracts of agricultural land in Salt Lake county, Utah. The defendants, four in number, owned and operated smelters in the same county, in proximity to each other and to complainants' farms. They were not acting in concert. The fumes from the smelters were shown to be destructive both to animal and vegetable life. Judge Marshall said that if each complainant were remitted to an action at law, the remedy would be worse than the evil. A decree was entered enjoining each defendant from further roasting or smelting objectionable ores.

It is suggested in the demurrers that complainants are seeking damages in such manner and form as can only be recovered in a court of law. I assume this refers to the prayer for an accounting; but as this matter has not been argued, I shall not consider it. The allegations of the bill are sufficient, if established, to entitle the complainants to equitable relief—that is, to a decree abating the business of further purchasing and receiving stolen ores—and for this purpose complainants are entitled to unite as against defendants.

The restraining order heretofore entered in this cause will be continued pending the suit.